[PUBLISH]

**CORRECTED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14254

_____

D. C. Docket No. 99-00173-CV-RLV-4

IN RE:

BAYSHORE FORD TRUCKS SALES, INC.,
HEINTZELMAN'S TRUCK CENTER, INC.,
ET AL.,
individually and as representatives for
a class of similarly situated entities,

Petitioners.

_____

05-14543 & 05-15152

_____

D.C. Docket No. 99-00173-CV-RLV-4

BAYSHORE FORD TRUCKS SALES, INC.,
HEINTZELMANS'S TRUCK CENTER, INC.,
ET AL.,

Plaintiffs-Appellants,

WESTGATE CLASS,

Intervenor-Plaintiff-
Appellant,

versus

FORD MOTOR COMPANY,

Defendant-Appellee.

_____

On Petition for Writ of Mandamus to the United States District Court for the
Northern District of Georgia and
On Appeal from the United States District Court for the
Northern District of Georgia

_____

**(December 11, 2006)**

Before TJOFLAT and COX, Circuit Judges, and GEORGE,[*] District Judge.

TJOFLAT, Circuit Judge:

This case was brought as a class action in the United States District Court for the Northern District of Georgia. Bayshore Ford Truck Sales, Inc., Heintzelman's Truck Center, Inc., LJL Truck Center, Inc., Peach State Ford Truck Sales, Inc., and Valley Ford Truck Sales, Inc. (collectively, the "Bayshore Dealers" or the "Dealers") sued Ford Motor Company ("Ford") for breach of their respective franchise agreements with Ford and for violations of federal law. They timely moved the district court to certify a class containing similarly situated Ford

_____

[*]Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

truck dealers.  The court denied their motion.  Thereafter, while the case was being prepared for trial, Westgate Ford Truck Sales, Inc. ("Westgate"), a member of the non-certified class, filed a class action law suit in an Ohio state court (the "Westgate Action").[1]  The complaint contained breach of franchise agreement claims practically identical to the Dealers' claims pending before the district court.  The Ohio court certified a class the district court had refused to certify – a class that, by definition, contained the Bayshore Dealers.  The Bayshore Dealers, wishing to litigate their claims as class members in the Ohio case, then moved the district court to permit them to dismiss their case against Ford.  The court denied their motion.  In a separate order, the court, acting on Ford's motion, enjoined Westgate from prosecuting the Ohio class action and the Dealers from participating in that action as class members.

The Bayshore Dealers and Westgate now separately appeal the district court's injunction.[2]  The Dealers' appeal challenges, in addition to the injunction,

---

[1]  Westgate Ford Truck Sales, Inc. v. Ford Motor Co., No. CV-02-483526 (Ohio Court of Common Pleas, filed Oct. 7, 2002).

[2]  The Dealers' appeal is No. 05-14543; Westgate's appeal is No. 05-15152.  This is the second time the Dealers' breach of contract claims against Ford have been before this court.  In Bayshore Ford Truck Sales, Inc. v. Ford Motor Co., 380 F.3d 1331 (11th Cir. 2004) ("Bayshore I"), we reversed the district court's grant of summary judgment to Ford on those claims and remanded the case for further proceedings because issues of contract interpretation had to be resolved.

3

the district court's order ruling on Ford's motion in limine declaring inadmissible a report prepared by the Dealers' expert, Fred A. Kinder. The Dealers also petition this court for a writ of mandamus, asking us to order the district court to grant their motions voluntarily to dismiss their suit against Ford.[3]

After considering the parties' briefs and entertaining oral argument, we (1) vacate the injunction; (2) deny the Dealers' petition for writ of mandamus; and (3) dismiss for lack of pendent appellate jurisdiction the Dealers' appeal of the district court's order excluding the Kinder report.

We organize this opinion as follows. Part I sets out the factual background and procedural history of this case and the Westgate Action. Part II addresses the threshold question of whether the district court had in personam jurisdiction over Westgate. Part III considers whether, assuming that it had in personam jurisdiction over Westgate, the district court had the legal authority to enjoin the Westgate Action[4] and to enjoin the Dealers from participating in that case as class members. Parts IV and V focus, respectively, on the Dealers' petition for a writ of

---

[3] The petition for writ of mandamus is No. 05-14254. We have consolidated this petition with the appeals designated in note 2, supra.

[4] As noted in the text supra, the district court enjoined Westgate, not the Westgate Action. For ease of discussion, however, we sometimes refer to the injunction as having been issued against the Westgate Action.

mandamus and the exclusion of the Kinder report.  Part VI summarizes our

holdings.

# I.

## A.

The Bayshore Dealers became Ford-authorized medium-duty and heavy-

duty truck ("Medium/Heavy Truck") dealers by entering into various franchise

agreements with Ford (the "Franchise Agreements").[5]  Until 1998, Ford sold truck

chassis to the Dealers at wholesale prices, which the Dealers would subsequently

complete, customize and resell to the public.  According to the Dealers, the

Franchise Agreements required Ford to publish its wholesale truck prices and

discounts to all of its dealers, and to sell its trucks to those dealers only at those

published prices and only with those published discounts.[6]

---

[5]  In their Third Amended Complaint, the complaint before us in this appeal, the Dealers defined "medium-duty trucks" as those designated by Ford as models F-600 to F-850, and defined "heavy-duty trucks" as those designated by Ford to be models F-850 and above.  The Dealers grouped the Franchise Agreements into three broad categories.  Under general franchise agreements, Ford authorized dealers to sell any Ford vehicle or replacement part manufactured by Ford, including any automobile or truck.  In the second category, which the Dealers termed "Ford Heavy Duty Truck Sales and Service Agreements," dealers could sell trucks and replacement parts for trucks designated F-850 or higher.  In the third category, termed "Ford Truck Sales and Service Agreements," dealers were authorized to sell medium-duty trucks and replacement parts for trucks designated by Ford as F-600 to F-850.  The Dealers contend, and Ford does not dispute, that they operated under both the second and third categories of franchise agreements.

[6]  This assertion is based on paragraph 10 of the Heavy Duty Truck Sales and Service Agreement, which states:
> Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will

In the early 1980s, Ford began a new wholesale pricing system for its trucks called the Competitive Price Assistance ("CPA") program. As part of the CPA program, the Dealers allege, Ford dramatically increased its Medium/Heavy Truck wholesale prices above the level at which its dealers could sell them on the retail market. As before, Ford published its prices to all of its dealers, but it also instituted a two-tier discounting structure. The first tier provided a standard discount on the published wholesale truck price, calculated by way of a formula given by Ford to all of its dealers. The second tier provided dealers with the

be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable HEAVY DUTY TRUCK TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN. Except as otherwise specified in writing by the Company, such prices, charges, discounts and terms of sale shall be those in effect, and delivery to the Dealer shall be deemed to have been made and the order deemed to have been filled on the date of delivery to the carrier or the Dealer, whichever occurs first. The Company has the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS by issuing a new HEAVY DUTY TRUCK or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price schedules or other notices. In the event the Company shall increase the DEALER PRICE for any COMPANY PRODUCT, the Dealer shall have the right to cancel, by notice to the Company within ten (10) days after receipt by the Dealer of notice of such increase, any orders for such product placed by the Dealer with the Company prior to receipt by the Dealer of notice of such increase and unfilled at the time of receipt by the Company of such notice of cancellation.

This language is shared by the Ford Truck Sales and Service Agreements for medium-duty trucks. The Heavy Duty Truck Sales and Service Agreement contains the following, additional language:

The Company shall make available to the Dealer price schedules for HEAVY DUTY TRUCKS for distribution to Authorized Ford Truck dealers in the DEALER'S LOCALITY, or the Company may directly distribute such price schedules to such dealers. Such price schedules shall not make reference to HEAVY DUTY TRUCK deposits, allowances, or other programs for which Authorized Ford Truck dealers are not eligible.

opportunity to appeal to Ford for an additional, case-by-case reduction in wholesale truck prices. Each dealer could submit to Ford information on the specific transaction for which the dealer sought the appeal-level price reduction. Ford would then grant or deny the request, and give its decision to the appealing dealer by facsimile, e-mail, or telephone. Ford did not send these individual pricing decisions to all of its other dealers. The Bayshore Dealers participated in this new pricing system.

B.

On July 1, 1999, the Dealers, represented by attorney James A. Pikl, challenged the CPA program by filing this law suit against Ford. In a three-count complaint,[7] the Dealers sought damages for breach of contract, i.e., paragraph 10 of the Franchise Agreements, and for violations of the Robinson-Patman Act of 1936[8] and the Automobile Dealers' Day in Court Act of 1956[9] (the "Bayshore

---

[7] We refer to the Dealers' Amended Complaint filed on July 13, 1999, which replicated the original complaint and merely added a demand for a trial by jury.

[8] The Robinson-Patman Act, currently codified at 15 U.S.C. § 13, prohibits price discrimination on sales of goods to similarly-situated distributors when the effect of such price discrimination is to reduce or eliminate competition, or to create a monopoly.

[9] The aim of the Automobile Dealers' Day in Court Act, currently codified at 15 U.S.C. § 1221 et seq., is to balance the bargaining power between automobile manufacturers and dealers by providing franchised dealers with a cause of action against manufacturers who, in the course of the franchisor/franchisee relationship, breach a statutorily-imposed duty of good faith. See Carrol Kenworth Truck Sales, Inc. v. Kenworth Truck Co., 781 F.2d 1520, 1525 (11th Cir. 1986); see generally, Scott Fuller, The Federal Dealers Day in Court Act, A Misnomer, 13 Ohio

Action"). The complaint also sought the certification of a class of similarly situated dealers.

The Dealers alleged that the Franchise Agreements required Ford to sell its trucks only at those wholesale prices Ford previously published to all of its authorized Medium/Heavy Truck dealers. Through the CPA program, Ford allegedly failed in its publishing obligation by refusing to disclose appeal-level discounts, and resultant price variances, to all dealers. The Dealers also claimed that the Franchise Agreements required Ford to sell trucks of similar grade and quality only in accordance with its previously published prices, an obligation Ford allegedly disregarded by providing its dealers with individualized, appeal-level discounts. According to the Dealers, Ford's breaches affected virtually every Ford truck dealer in the United States.

The Dealers' claim under the Dealers' Day in Court Act accused Ford of controlling dealer profits, coercively and unfairly discriminating in the prices it offered dealers for trucks of similar grade and quality, and of breaching the basic fairness obligations imposed by the Act.[10] Similarly, the Dealers alleged that

_____

N.U. L. Rev. 447 (1986).

[10] On November 8, 1999, Ford moved the district court to dismiss in its entirety the Dealers' Second Amended Complaint. On January 19, 2000, the court granted the motion only with respect to the Dealers' Day in Court Act claim. Accordingly, the Dealers did not seek class certification on that claim. Although the Dealers included the Dealers' Day in Court Act claim in

8

Ford's purported price discrimination was malicious and done in bad faith, thereby violating the Robinson-Patman Act. Again, the Dealers claimed that these violations negatively impacted almost every Ford Medium/Heavy Truck dealer in the United States.

On April 14, 2000, the Dealers, now proceeding on their Second Amended Complaint,[11] filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23.[12] In their motion, the Dealers requested class certification on their breach of contract and Robinson-Patman Act claims, and proposed the following class definitions, the first pertaining to Medium/Heavy Trucks (the "Bayshore Class"), the second pertaining to the replacement parts for those trucks (the "Replacement Parts Class"):

---

their Third Amended Complaint, filed on December 6, 2002, the court entered a consent order acknowledging the parties' stipulation that the claim had not been revived.

[11] The Dealers obtained leave to file a Second Amended Complaint and did so on October 21, 1999. Ford moved to dismiss that complaint on November 8, 1999 for failure to state a claim for relief. See Fed. R. Civ. P. 12(b)(6). The court granted the motion as to the Dealers' Day in Court claims, but denied it as to the breach of contract and Robinson-Patman Act claims.

[12] The Dealers' complaint, and the amended complaints that followed, contained a separate class certification section as required by N.D. Ga. R. 23.1(A)(2). The operative complaint at the time the Dealers filed the Class Certification Motion was the Second Amended Complaint, filed on October 21, 1999. Pursuant to N.D. Ga. R. 23.1(B), plaintiffs seeking class certification must, within 90 days of filing the complaint, move the court "as to whether the suit may be maintained by class action." The district court waived the time restriction imposed by this rule in an order entered on September 21, 1999.

9

> All franchised Ford dealers within the jurisdiction of this Court who ordered and purchased from Ford any Ford Medium/Heavy Truck during model years 1990-1998. The term "Medium/Heavy Truck" is defined to be a truck classified by Ford with the designation F-600 or above.
>
> All franchised Ford dealers within the jurisdiction of this Court who ordered and purchased from Ford any Replacement Part for Medium/Heavy Trucks during model years 1990 - 1998. The term "Medium/Heavy Truck" is defined to be a truck classified by Ford with the designation F-600 or above.

The Dealers did not provide a list of the Ford dealers who were purportedly "within the jurisdiction of the Court," and they offered no means by which the district court could generate such a list. In support of their motion, the Dealers averred that they met the four requirements for class certification set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.[13]

The district court denied the Dealers' motion for class certification in an order dated September 5, 2000. The court quickly dispatched the Replacement Parts Class. The court noted that the Dealers' memorandum of law in support of class certification referred to this class in but one paragraph, which contained what the court regarded as vague and conclusory assertions. Without more, the court

---

[13] Rule 23(a) provides:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

stated, it could not determine whether the CPA program was improperly conducted, how many dealers were adversely affected, or whether the allegations were typical or common to the putative class. In any event, the Replacement Parts Class suffered from the same fatal defect the court found in the Bayshore Class; the Dealers' claims were antagonistic to each others' and to those of the putative class members.

In analyzing the Dealers' request to certify the Bayshore Class, the court assumed without deciding that the class satisfied the Rule 23(a) requirements of numerosity, typicality and commonality, and focused instead on whether the Dealers could be adequate class representatives. In assessing the adequacy of the Dealers' class representation, the court observed that Ford made the appeal-level CPA program available to all of its dealers, including the plaintiffs, whether the dealers were competing against each other or against non-Ford dealers. Moreover, the court found that Ford offered the same discount to each dealer when they competed against each other, citing the Fifth Circuit's discussion of the CPA program in Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 323 (5th Cir. 1998).[14]

---

[14] The district court also relied on Metro Ford to illustrate how the interests of dealers were not uniform. In that case, the Fifth Circuit determined that Metro Ford had been cheating the CPA program by applying for wholesale price reductions in the name of one customer while selling the trucks to another, thus receiving discounts to which it was not entitled. See Metro

Relying on Robinson-Patman Act cases, the court concluded that the Bayshore Dealers could not serve as adequate class representatives due to the "inherently antagonistic interests of the class members." Specifically, the court determined that the Dealers' theory of liability reflected inherent antagonism, dividing the class members into "favored" and "disfavored" dealers. Although the Bayshore Dealers insisted that they and other disfavored dealers suffered damages by paying higher wholesale prices on comparable trucks than those paid by favored dealers, the court found that every dealer received sufficient discounts to consummate many sales over the relevant time period. In the court's view, the Bayshore Dealers were attempting to recoup lost profits on the sales they had lost to other, "favored" dealers. Conversely, the Bayshore Dealers profited on many transactions at the expense of other dealers when their CPA discount enabled them to make a sale; not only had the Bayshore Dealers suffered no harm as a result of these transactions, their theory of liability required the finding that their profitability came at the direct expense of other dealers. The proposed class would consequently include members who benefitted from the same acts that supposedly harmed other members of the class. This defect caused the court to deny the

Ford, 145 F.3d at 323. To the court, the situation in Metro Ford demonstrated the friction that existed amongst the putative class members.

plaintiffs' motion for certification of the Bayshore Class on the basis of inadequate class representation under Rule 23(a). The court's order made no distinction between the Dealers' breach of contract claims and their Robinson-Patman Act claims.

On September 19, 2000, the Dealers moved the district court to reconsider its denial of class certification, but only with respect to the Bayshore Class.[15] The court denied the motion on May 21, 2001. The Dealers thereafter petitioned this court for permission to appeal the district court's refusal to certify the Bayshore Class. We denied their petition on June 29, 2001.

On November 14, 2002, the Dealers moved the court for leave to amend their Second Amended Complaint, attaching a proposed Third Amended Complaint that omitted their Robinson-Patman Act claims. Ford did not object to the motion, and the court granted it on December 6, 2002. As of that date, the only operative claims remaining in the case were the Dealers' breach of contract claims.[16]

---

[15] The Dealers filed their motion pursuant to N.D. Ga. Rule 7.2(E). In the motion, the Dealers explicitly withdrew their request for certification of the Replacement Parts Class.

[16] It is important to note that the Dealers and Ford acknowledge they are non-diverse for purposes of federal subject matter jurisdiction under 28 U.S.C. § 1332. At the time the law suit was filed, the court had subject matter jurisdiction based on the Dealers' federal statutory claims, pursuant to 28 U.S.C. § 1331. Though the court's order granting leave to amend the Second Amended Complaint contains no reference to subject matter jurisdiction, we can only conclude that the court, in its discretion, retained supplemental jurisdiction over the breach of contract

On March 31, 2003, Ford filed a motion for summary judgment. The court granted the motion on May 20, 2003, and the Dealers appealed. We affirmed in part and reversed and remanded in part, concluding that the Franchise Agreements were ambiguous as to whether Ford had an obligation to publish its wholesale prices solely to individual dealers, to all authorized dealers, or to all authorized dealers in a particular locality. Bayshore I, 380 F.3d at 1337. Further proceedings were necessary to determine the meaning of certain provisions of those agreements.

## C.

On October 7, 2002, prior to the district court's entry of summary judgment against the Bayshore Dealers, Westgate, represented by attorney James A. Pikl, filed the Westgate Action in the Court of Common Pleas of Cuyahoga County, Ohio. Westgate's complaint alleged that Ford had breached the Franchise Agreements, the same agreements involved in the Bayshore Action (except for the named dealer franchisees), and sought the certification of a class of similarly situated dealers nation-wide. The allegations in Westgate's complaint are for the most part identical to those made in the Bayshore Dealers' Third Amended

claims pursuant to 28 U.S.C. § 1367, which grants a district court discretion to retain such jurisdiction after if it "has dismissed all claims over which it has original jurisdiction."

Complaint. Like the Dealers, Westgate accused Ford of breaching paragraph 10 of the Franchise Agreement by failing to publish to all of its authorized dealers the individual discounts it granted under the appeal-level CPA program, and by failing to sell its Medium/Heavy Trucks only at previously published prices.

On August 1, 2003, little more than two months after the district court granted Ford summary judgment in the Bayshore Action, Westgate moved the Ohio court to certify the following class:

> All franchised Ford Dealers operating in the United States who purchased from Ford any truck of series 600 and above (Medium/Heavy Truck) in the time period commencing on October 5, 1987 to the present [the "Westgate Class"].

Rejecting the district court's reasons for denying the Dealers' motion for class certification, the Ohio court granted the motion on June 7, 2005. In certifying the class (the "Westgate Class"), the court distinguished it from the putative classes in the Bayshore Action (the Bayshore Class and the Replacement Parts Class), because the Westgate Action was solely a suit for breach of contract. By contrast, the Ohio court noted, the Bayshore Dealers sought class certification based on their Robinson-Patman Act claims as well as the breach of contract claims. Practically speaking, the court viewed these claims as part of the class definition the Dealers proposed, and viewed their claims as bundled for the purpose of certification. Importantly, the Ohio court understood the district

15

court's finding of antagonism amongst the Bayshore Class members to turn on the district court's analysis of the Dealers' Robinson-Patman Act claims. In granting Westgate's motion for class certification, the Ohio court did not consider the district court's discussion of antagonism under its Robinson-Patman Act analysis applicable to Westgate's breach of contract claims. In sum, finding no other basis for class antagonism, the court certified the Westgate Class.

On June 24, 2005, Ford appealed the certification ruling to the Ohio Court of Appeals.[17] A week after Ford took its appeal, the Bayshore Dealers moved the district court to dismiss their law suit pursuant to Federal Rule of Civil Procedure 41(a)(2);[18] they would pursue their breach of contract claims in the Westgate Action as unnamed class members.

Ford responded to the Bayshore Dealers' motion on July 13, 2005, filing an application for injunctive relief pursuant to the Anti-Injunction Act, 28 U.S.C.

---

[17] That court has stayed the appeal pending our decision.

[18] Rule 41(a)(2) states, in pertinent part:
> [A]n action shall not be dismissed at the plaintiff's insistence save upon order of the court and upon such terms and conditions as the court deems proper. . . . Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

Fed. R. Civ. P. 41(a)(2).
The Dealers could not obtain a dismissal of their law suit without a court order under Rule 41(a)(1) by filing a notice of dismissal because Ford had already filed a motion for, and had obtained, summary judgment.

§ 2283,[19] asking the district court to enjoin (1) the named and unnamed members of the national class referred to in the district court's September 5, 2000 order denying the Dealers' motion for class certification and (2) their lawyer, James A. Pikl, from prosecuting the Westgate Action. In the alternative, Ford's application asked the court to enjoin the Dealers and Pikl, who, as noted above, had been, and still was, representing them as well, from participating in any other nationwide class action alleging breach of paragraph 10 breach of the Franchise Agreement.

In the brief it filed in support of its application for injunctive relief, Ford asserted that the Ohio court's certification of the Westgate Class undermined the district court's ability to enforce its judgment, i.e., its September 5, 2000 order denying the Dealers' motion for class certification.[20] Ford argued that the Ohio court would not have granted Westgate class certification had not Pikl falsely

---

[19] The Anti-Injunction Act states:
A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

[20] Moreover, Ford accused Pikl of venue-shopping. Ford informed the district court that three other Ford heavy-duty truck dealers, also represented by Pikl, filed a class action lawsuit in Pennsylvania state court four months after we denied the Bayshore Dealers permission to appeal the district court's denial of their Class Certification Motion. See Hubler Corp. d/b/a/ Hubco Ford Truck Sales, Inc. v. Ford Motor Co., No. 01006427-25-1 (Court of Common Pleas, filed Oct. 9, 2001). According to Ford, the Pennsylvania complaint alleged a breach of contract claim identical (except as to the name of the plaintiff) to the breach of contract claim asserted in the Bayshore Action. The plaintiffs in that case moved voluntarily to dismiss their case the day after Westgate filed its complaint in Ohio. Over Ford's objection, the Pennsylvania court granted the motion.

17

represented that the breach of contract claims presented to that court differed materially from the breach of contract claim pending in the Bayshore Action. Ford buttressed this argument by reminding the district court that in the Dealers' motion voluntarily to dismiss the Bayshore Action, Pikl took the exactly opposite position. He represented that the claims asserted in the Westgate Action were precisely the same as those asserted in the Bayshore Action, and that the court should permit the Dealers to dismiss the Bayshore Action and pursue their claims in the Westgate Action.

On July 27, 2005, Westgate moved the district court pursuant to Federal Rule of Civil Procedure 24 for leave to intervene in the Bayshore Action for the sole purpose of opposing Ford's efforts to obtain injunctive relief.[21] Westgate

---

[21] Rule 24, Intervention, provides, in pertinent part:

> (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
> (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24.

argued that it had the right to intervene as a matter of right, under Rule 24(a), and permissively, under Rule 24(b). Westgate's motion made no mention of the underlying contract dispute between the Bayshore Dealers and Ford. Without opposition from Ford, the court granted Westgate's motion "for the purpose of responding to [Ford's] application for injunctive relief." The court did not specify whether it was granting Westgate intervention under Rule 24(a) or (b).

On August 3, 2005, the district court denied the Dealers' motion to dismiss the Bayshore Action. The next day, the court issued the injunction Ford had requested. Relying exclusively on the Seventh Circuit's opinion in In Re Bridgestone/Firestone Tires Products Liability Litigation, 333 F.3d 763 (7th Cir. 2003), and "adopt[ing] the reasoning and rationale of that case," the district court entered the following injunction:

> All members, named and unnamed, of the putative nationwide class defined in this court's order dated September 5, 2000,[22] and their lawyers are hereby enjoined from again attempting to have a nationwide class certified and from further prosecuting any nationwide class over the defendant's objection with respect to the same class and the claims alleged in this case.

The court rejected the Ohio court's interpretation of its September 5, 2000 order denying the Bayshore Dealers' motion for class certification. The district court

---

[22] The district court's order refers to the "nationwide class defined" by the court's September 5, 2000 order; however, because that order denied class certification in the Bayshore Action, the reference, presumably, is to the Bayshore Class described in the Dealers' motion for class certification.

19

stated that the September 5 order pertained to the breach of contract claims as well as the Dealers' Robinson-Patman claims: "The plaintiffs had not sought certification of different classes for their different claims, and this court considered all claims asserted by the plaintiffs when it denied their motion for class certification." Acknowledging that "a district court should be very hesitant to stay state court proceedings," the court nevertheless concluded that the Anti-Injunction Act, 28 U.S.C. § 2283, permitted it to stay the prosecution of the Ohio litigation because doing so was "necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[23] Id.

### D.

On March 21, 2003, prior to moving the district court for summary judgment, Ford filed a motion to strike Fred A. Kinder as the plaintiffs' expert witness. The Dealers had retained Kinder, whom they described as a damages expert, to produce a report (the "Kinder Report") setting forth the Dealers' two damages models and summarizing the voluminous Medium/Heavy Truck pricing data contained in Ford's North America Vehicle Information System ("NAVIS") and CPA databases. Significantly, although the Dealers characterized Kinder in

---

[23] Although Ford sought an injunction solely "to protect or effectuate" the district court's judgment, the court specifically referenced both this and the "in aid of jurisdiction" exceptions to the Anti-Inunction Act.

their initial submissions as their expert witness on damages, they characterized the

Kinder Report as a summary under Federal Rule of Evidence 1006.[24]

Much of the debate over the admissibility of the Kinder Report and the

qualification of Kinder as an expert witness depends on whether the Kinder Report

constituted a summary under Rule 1006 and whether Kinder could be

characterized as either an expert witness, who met the standards of Rule 702,[25] or

simply a lay witness.  In its March 21 motion, Ford insisted that Kinder could not

pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,

113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Moreover, Ford argued that the

Dealers' characterization of the Kinder Report as a Rule 1006 summary was a

subterfuge – an attempt to gain admissibility for otherwise inadmissible expert

---

[24]  Rule 1006 states:
     The contents of voluminous writings, recordings, or photographs which cannot
conveniently be examined in court may be presented in the form of a chart, summary, or
calculation.  The originals, or duplicates, shall be made available for examination or
copying, or both, by other parties at reasonable time and place.  The court may order that
they be produced in court.
Fed. R. Evid. 1006.

[25]  Rule 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as an expert by
knowledge, skill, experience, training, or education, may testify thereto in the form of an
opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
testimony is the product of reliable principles and methods, and (3) the witness has
applied the principles and methods reliably to the facts of the case.
Fed. R. Evid. 702.

testimony. On July 28, 2005, after holding a <u>Daubert</u> hearing, the court entered an order granting Ford's motion to exclude Kinder as an expert witness.

Because the order was silent as to the admissibility of the Kinder Report as a Rule 1006 summary, the Dealers moved the court to rule on that issue and, specifically, whether Kinder could testify as a summary witness. Responding in an order dated August 3, 2005, the court stated that the July 28 order only dealt with Kinder's status as an expert witness, because Ford's motion did not challenge his status as a possible summary witness. The court thus left open the question of whether the Kinder Report would be admitted under Rule 1006. Ford immediately moved the court to strike the Kinder Report as a Rule 1006 Summary. The court granted the motion on August 4, 2005, in the same order in which it enjoined further prosecution of the Westgate Action. The court found that the report was "not a mere summary of the Ford databases," but instead "involve[d] the systematic computation of damages via models created by Kinder, based on certain speculative calculations he made at the behest of the plaintiffs' counsel." Accordingly, the court deemed the Kinder Report the report of an expert witness, not a Rule 1006 summary, and because Kinder could not testify as an expert witness, the report would not be admitted.

## II.

Westgate contends that because it never appeared before the district court as a party to the Bayshore Action, the court lacked jurisdiction over its person and, therefore, authority to enjoin it from prosecuting the Westgate Action. Even if it were a putative member of the Bayshore Class, Westgate argues, the district court could not assume jurisdiction over its person once the court denied the Dealers' motion for class certification.

## A.

The granting of class certification under Rule 23 authorizes a district court to exercise personal jurisdiction over unnamed class members who otherwise might be immune to the court's power.[26] Here, the district court refused to grant class certification in the Bayshore Action because the Dealers failed to demonstrate that they would be adequate class representatives, a prerequisite to certification under Rule 23(a)(4). Once this decision was made, Westgate became a stranger to the Bayshore Action. See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 134 F.3d 133, 141 (3d Cir. 1998) (holding that courts lack in personam jurisdiction over putative class members where class certification is denied and no basis exists on which to infer the class members'

___

[26] See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811, 105 S. Ct. 2965, 2974, 86 L. Ed. 2d 628 (1985) ("[A] forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant.").

23

consent to jurisdiction). The denial of class certification limited the court's <u>in personam</u> jurisdiction solely to the parties appearing before it, namely the Bayshore Dealers and Ford. Consequently, the denial could not have been binding on Westgate.[27] This does not end our jurisdictional analysis, however, because we must also consider the jurisdictional effect of Westgate's Rule 24 motion to intervene.

B.

Rule 24 provides two avenues for a nonparty to intervene in a lawsuit; intervention as of right and intervention with permission of the court. A nonparty claiming to have a right to intervene may invoke Rule 24(a), which applies "when a statute of the United States confers an unconditional right to intervene," or "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a); <u>see</u> <u>also</u> <u>Chiles v. Thornburgh</u>, 865 F.2d 1197, 1213 (11th Cir. 1989).

---

[27] <u>See</u>, <u>e.g.</u>, <u>Bridgestone/Firestone</u>, 333 F.3d at 768 ("A decision with respect to the class is conclusive only if the absent members were adequately represented by the named litigants and class counsel."). As the district court's order denying class certification indicates, that requirement was not met in this case.

If a nonparty lacks the right to intervene, Rule 24(b) allows the court to grant it permission to do so "when a statute of the United States confers a conditional right to intervene," or "when [the] applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b); see also Chiles, 865 F.2d at 1213. "[I]t is wholly discretionary with the court whether to allow intervention under Rule 24(b) and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention." Worlds v. Dep't of Health and Rehabilitative Servs., 929 F.2d 591, 595 (11th Cir.1991) (quoting 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1913, at 376–77 (2d ed. 1986)).

Once a court grants intervention, whether of right or by permission, the "intervenor is treated as if [it] were an original party and has equal standing with the original parties." Marcaida v. Rascoe, 569 F.2d 828, 831 (5th Cir. 1978) (per curiam) (citing 7C Wright, Miller & Kane, supra, § 1920, at 488).[28] Toward that end, both Rule 24(a) and Rule 24(b) require the prospective intervenor to anchor its request in the dispute giving rise to the pending lawsuit. The prospective

---

[28] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

25

intervenor must demonstrate "an interest relating to the property or transaction which is the subject of the action" if relying on Rule 24(a), or it must show that its "claim or defense and the main action have a question of law or fact in common" if relying on Rule 24(b). In either case, the plain language of Rule 24 requires the intervenor's interest to be based on the action pending before the court. See Mt. Hawley Ins. Co. v. Sandy Lake Props., Inc., 425 F.3d 1308, 1312 (11th Cir. 2005) (per curiam) (upholding district court's denial of a motion for permissive intervention because the purpose of intervention was unrelated to the issues presented by the underlying suit); S. Cal. Edison Co. v. Lynch, 307 F.3d 794, 803 (9th Cir. 2002) (holding that Rule 24(a) requires a relationship between the intervenor's legally protectable interest in the suit and the plaintiff's claims, and that such a relationship exists "if the resolution of the plaintiff's claims actually will affect the applicant").

Westgate pointed neither to a relevant statute nor to common questions of law or fact in support of its motion to intervene. Instead, Westgate merely stated that it had a "clear interest" in the subject matter of the Injunction Application for purposes of Rule 24(a), and that the issues raised by Ford's Injunction Application affected it for purposes of Rule 24(b). Although Westgate's breach of contract allegations in the Ohio court were nearly identical to those made by the Dealers in

26

the Bayshore Action,[29] Westgate's purpose in seeking intervention had nothing to do with the breach of contract allegations in the Bayshore Action.[30] Rather, as indicated <u>supra</u>, Westgate's stated purpose in seeking intervention was to "respond[] to the Application for Injunctive Relief filed by Defendant Ford Motor Company." Thus, the motion to intervene focused on the collateral issue of whether an injunction would impair or impede Westgate's ability to litigate its class action in Ohio. If Westgate were a properly intervening party – which it was not – its motion would have shown how common questions of fact or law placed it in the same stead as the Dealers in the Bayshore Action. Failing to show that connection, Westgate could not satisfy the requirements of Rule 24.

That Westgate had no intention of intervening as a plaintiff in the Bayshore

---

[29] Both Westgate (in the Ohio case) and the Dealers (in the district court) accuse Ford of refusing to publish all offered discounts and wholesale prices for Ford Medium/Heavy Trucks and to sell those trucks only at prices previously published to all Medium/Heavy Truck dealers. Additionally, both Westgate and the Dealers assert that Ford's refusal constitutes a breach of paragraph 10 of the Franchise Agreements, which they allege Ford has signed with all of its Medium/Heavy Truck dealers. Finally, both Westgate and the Dealers seek monetary damages to redress Ford's breaches, although Westgate claims to have calculated damages in a manner different from the method employed by the Dealers. Indeed, the claims and relief sought in the two actions are so similar that the Dealers want to dismiss their suit so they can join the Westgate Action as unnamed class members.

[30] Westgate's motion for leave to intervene pointed to no questions of law or fact at all; it merely repeated the language of Rule 24, and made the conclusory assertions that "[t]he <u>Westgate</u> Plaintiffs have a clear interest in the subject matter of Ford's Application for Injunctive Relief," "[t]he disposition of the Application could certainly impair the ability of the <u>Westgate</u> Plaintiffs to protect that interest," and that "Ford's Application raises issues of fact and law that affect the <u>Westgate</u> Plaintiffs as well as the <u>Bayshore</u> Plaintiffs."

27

Action is further illustrated by its response to Ford's application for injunctive relief[31] and the district court's September 8, 2005 order denying Westgate's motion for reconsideration of the August 4, 2005 order granting Ford's application. Westgate's response offered several theories as to why "well-settled principles of federalism and state sovereignty" barred the district court from enjoining the Westgate Action, which, according to Westgate, would amount to an impermissible federal court review of the Ohio court's order granting class certification. In no way, however, did these theories bear upon the contract dispute between the Dealers and Ford or implicate the substantially similar contract dispute between Westgate and Ford. The court therefore stated in its September 8 order that it had "granted the motion to intervene filed by [Westgate] for the limited purpose of responding to [Ford's] motion for injunctive relief." That is, the district court apparently did not understand Westgate's motion to be seeking intervention as to the merits of the Bayshore Action.

Moreover, the outcome of the Bayshore Action would have no legal impact on Westgate. Westgate was not a signatory to any of the Franchise Agreements that are the subject of the Bayshore Action; the legal rights the Dealers seek to

---

[31] Westgate filed a response to Ford's application for injunctive relief on July 27, 2005, the same day that it filed its motion to intervene.

vindicate in that case are solely their own, and neither Westgate nor the Dealers contend otherwise. A result for the Dealers, favorable or unfavorable, would thus leave Westgate's rights unaffected.[32] Finally, once the circumstances of this case are seen in their proper perspective, it makes little sense for Westgate to have become a party to the Bayshore Action. Westgate's express purpose in seeking intervention in the first instance was to challenge an injunction that would foreclose its ability to litigate in another forum, an Ohio court of common pleas.

The district court's order granting Westgate's intervention did not indicate whether the court was acting pursuant to Rule 24(a) or Rule 24(b). Rather, the order simply stated that "[t]he motion of the <u>Westgate</u> class representatives to intervene for the purpose of responding to the defendant's application for injunctive relief . . . is GRANTED." Nevertheless, given the language of the order, the focus and express purpose of Westgate's motion to intervene, and the arguments Westgate made in response to Ford's Injunction Application, it is

---

[32] It is for this reason that issues of collateral estoppel would have no bearing on any "interest" Westgate may have in the Bayshore Action. Under certain circumstances, which do not apply here, a nonparty seeking intervention may assert the potential collateral estoppel effects of a judgment as an "interest" sufficient to warrant intervention under Rule 24(a). Under Ohio law, which would govern Westgate's use of a judgment for or against Ford, "mutuality of parties is a requisite to collateral estoppel." <u>Broz v. Winland</u>, 629 N.E.2d 395, 397 (Ohio 1994). Westgate, not being a party to the underlying dispute between the Dealers and Ford, and not being in privity with the Dealers, has no interest in the outcome of that dispute for purposes of collateral estoppel.

reasonable to infer that the court believed that it could grant Westgate intervenor status for the exclusive purpose of challenging Ford's application for an injunction.[33] Rule 24, however, does not contemplate intervention for such purpose. Hence, the court erred in granting Westgate's motion to intervene.

C.

Although the court erred, we are in no position to reverse its decision here. Westgate challenges the district court's jurisdiction over its person, but by filing a successful motion to intervene, it acquiesced to such jurisdiction. See County Sec. Agency v. Ohio Dep't of Commerce, 296 F.3d 477, 483 (6th Cir. 2002) ("[A] motion to intervene is fundamentally incompatible with an objection to personal jurisdiction."); Pharm. Research and Mfrs. of Am. v. Thompson, 259 F. Supp. 2d 39, 59 (D.D.C. 2003); 7C Wright, Miller & Kane, supra, § 1920, at 490 ("[T]he intervenor submits himself to the personal jurisdiction of the court by seeking to intervene in the action and cannot move to dismiss on that ground.").

Moreover, it is "a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." Thunderbird, Ltd. v. First Fed. Sav. & Loan Ass'n of Jacksonville, 908 F.2d 787,

---

[33] While it is true that a district court may place conditions on the terms of a permissive intervention, see 7C Wright, Miller & Kane, supra, § 1922, at 502, we do not believe that a court may impose conditions that effectively rewrite the rule as it effectively did in this instance.

795 (11th Cir. 1990); see also EEOC v. Mike Smith Pontiac GMC, Inc., 896 F.2d 524, 528 (11th Cir. 1990) ("[E]ven if the trial court did employ the incorrect standard in determining whether to set aside the default, we will not reverse its decision because [cross-appellant] invited the error."). Having invited the court's exercise of personal jurisdiction by moving for intervention, Westgate "cannot now claim the trial court erred by taking the very action [Westgate] urged upon it." Thunderbird, 908 F.2d at 794. Whereas it would not have been the case absent intervention, Westgate willingly submitted to the personal jurisdiction of the district court, and thereby agreed to be bound by the court's decision granting Ford the injunction it requested.[34] We therefore move to the question of whether

---

[34] We find it worthwhile to point out that Westgate could have pursued other avenues to challenge Ford's application for injunctive relief without submitting to the in personam jurisdiction of the district court, both before and after the injunction issued. For example, Westgate could have sought leave from the district court to file an amicus curiae brief. Unlike the Supreme Court Rules and the Federal Rules of Appellate Procedure, the Federal Rules of Civil Procedure do not specifically provide for the filing of amicus curiae briefs at the district court level. Nevertheless, district courts possess the inherent authority to appoint "friends of the court" to assist in their proceedings. See Lathrop v. Unidentified, Wrecked & Abandoned Vessel, 817 F. Supp. 953, 960 n.10 (M.D. Fla. 1991); Resort Timeshare Resales, Inc. v. Stuart, 764 F. Supp. 1495, 1500– 01 (S.D. Fla. 1991). An amicus curiae does not become a party to the case, and thus is not subject to the in personam jurisdiction of the court. See City of Winter Haven v. Gillespie, 84 F.2d 285, 287 (5th Cir. 1936) (stating that City, which appeared before the court as amicus curiae, was not a party to the case).

As illustrated by Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969), Westgate could also have appealed the injunction directly to this court after it issued. In that case, the district court entered an injunction against Hazeltine Research, Inc., parent to the named counter-defendant, HRI Inc. Hazeltine was not a named party to the suit, and it made no formal appearances before the district court. The district court concluded that Hazeltine had by prior stipulation conceded that it was "in privity" with HRI, and thereby subjected itself to the court's in personam jurisdiction. Id. at 109, 89 S. Ct. at 1569.

the district court had authority to issue that injunction.

## III.

In laying out our discussion of the district court's injunction, we note that the district court's order effectively constitutes two injunctions: one purporting to foreclose Westgate's prosecution of the Westgate Action, and the other forbidding the Dealers from participating in that action as unnamed class members. These two injunctions require two different sets of analyses. We will consider the injunction of the Westgate's prosecution of the Westgate Action in Ohio court under the Anti-Injunction Act, and subsequently weigh the injunction of the Dealers' participation in the Westgate Action under the All Writs Act.

The Anti-Injunction Act directs that a court of the United States may not grant an injunction to stay proceedings in a state court except: (1) "as expressly authorized by Act of Congress"; (2) "where necessary in aid of its jurisdiction"; or (3) "to protect or effectuate its judgments." 28 U.S.C. § 2283. The Act functions as "an absolute prohibition against federal court enjoinment of state court

---

Rejecting this determination, the Supreme Court upheld the decision by the court of appeals vacating the injunction. Id. at 110, 89 S. Ct. at 1569. In so doing, the Court approved of Hazeltine's direct appeal of the injunction to the court of appeals, noting that prior to the appeal, Hazeltine "never had its day in court" to challenge the district court's claim of in personam jurisdiction. Id. at 111, 89 S. Ct. at 1570. See also R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 955–59 (4th Cir. 1999) (permitting direct appeal under 28 U.S.C. § 1292(a) by an enjoined nonparty, where the nonparty made no appearance in the district court and challenged that court's in personam jurisdiction on appeal).

32

proceedings, unless the injunction falls within one of the specifically defined exceptions," Nat'l R.R. Passenger Corp. v. Florida, 929 F.2d 1532, 1535 (11th Cir. 1991), and thereby "prevent[s] needless friction between state and federal courts," id. at 1536 (quoting Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co., 309 U.S. 4, 9, 60 S. Ct. 215, 218, 84 L. Ed. 537 (1940)).

The Supreme Court has repeatedly emphasized that the lower courts are to interpret these exceptions strictly. "This is not a statute conveying a broad general policy for appropriate ad hoc application. Legislative policy is here expressed in a clear-cut prohibition qualified by only specifically defined exceptions." Amalgamated Clothing Workers of Am. v. Richman Bros., 348 U.S. 511, 515–16, 75 S. Ct. 452, 455, 99 L. Ed. 600 (1955); see also Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146, 108 S. Ct. 1684, 1689, 100 L. Ed.2d 127 (1988) ("[The Anti-Injunction Act's] exceptions are narrow and are not to be enlarged by loose statutory construction.") (internal quotations omitted); Carter v. Ogden Corp., 524 F.2d 74, 76 (5th Cir. 1975) ("[The Anti-Injunction Act] has been interpreted strictly by the Courts."). Accordingly,"'[p]roceedings in state court should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately the United States Supreme Court." Nat'l R.R. Passenger Corp., 929

33

F.2d at 1536 (quoting <u>Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs</u>, 398 U.S. 281, 287, 90 S. Ct. 1739, 1743, 26 L. Ed.2d 234 (1970)).

Although federal courts are instructed to tread carefully when considering whether to stay state court proceedings, as such a decision directly implicates the "very delicate balance struck between the federal and state judicial systems," <u>Wesch v. Folsom</u>, 6 F.3d 1465, 1469 (11th Cir. 1993), the decision is ultimately left to the district court's sound discretion. <u>Id.</u> We review a decision staying a state court proceeding under the abuse-of-discretion standard. "'A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous.'" <u>Klay v. United Healthgroup, Inc.</u>, 376 F.3d 1092, 1097 (11th Cir. 2004) (quoting <u>Martin v. Automobile Lamborghini Exclusive, Inc.</u>, 307 F.3d 1332, 1336 (11th Cir. 2002)).

In its August 4, 2005 order, the district court concluded that enjoining Westgate, the Bayshore Dealers, and their counsel from prosecuting or participating in the Westgate Action fell within the Anti-Injunction Act's second and third exceptions, because the injunction was "necessary in aid of [the district

34

court's] jurisdiction, or to protect or effectuate its judgments."[35]  We review the court's reliance on these two exceptions in order.

## A.

The Anti-Injunction Act allows a federal court to enjoin a state court proceeding "in aid of its jurisdiction."  28 U.S.C. § 2283.  In <u>Atlantic Coast Line</u>, the Supreme Court emphasized that <u>necessity</u> is required to invoke this exception; "it is not enough that the requested injunction is related to that jurisdiction."  <u>Atl. Coast Line</u>, 398 U.S. at 295, 90 S. Ct. at 1747.  Ordinarily, a federal court may issue an injunction "in aid of its jurisdiction" in only two circumstances: (1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or, (2) the state court entertains an <u>in rem</u> action involving a res over which the district court has been exercising jurisdiction in an <u>in rem</u> action.  According to the Anti-Injunction Act's 1948 Reviser's Notes, an injunction in the first scenario makes "clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts,"  28 U.S.C. § 2283 (Reviser's Notes), for the removal has terminated the state court's jurisdiction over the case.  An injunction in the second scenario is an

---

[35]  It is well settled that an injunction directed at the parties and their counsel, but not at the state court itself, may still be subject to the Anti-Injunction Act.  <u>See</u> <u>In re Diet Drugs</u>, 282 F.3d 220, 233 (3d Cir. 2002); <u>Signal Props., Inc. v. Farha</u>, 482 F.2d 1136, 1137 (5th Cir. 1973).

35

acknowledgment that when a federal court is the first to acquire subject matter jurisdiction over an action in rem, "the effect is to draw to the federal court the possession or control, actual or potential, of the res." Kline v. Burke Constr. Co., 260 U.S. 226, 229, 43 S. Ct. 79, 81, 67 L. Ed. 226 (1922).  Control over the res is fundamental to the district court's ability to render judgment in the case; i.e., a final decision with respect to the res necessarily affect the rights of all persons having an interest in the res.  "[T]he exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat" the federal court's control.  Id.; see also United States v. $270,000 in U.S. Currency, Plus Interest, 1 F.3d 1146, 1148 (11th Cir. 1993) ("A state court and a federal court cannot simultaneously exercise in rem jurisdiction over the same property.").  The converse is also true. "[W]here the [in rem] jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction." Kline, 260 U.S. at 229, 43 S. Ct. at 81.

Neither of these scenarios is present in the case at hand.  First, the Bayshore Action did not come to the district court via removal.  Second, the Bayshore Action is an action in personam, not an action in rem.

We have acknowledged a third scenario in which the enjoining of a state court proceeding might be necessary and thus permissible.  Called the "complex

multi-state litigation" exception, it enables a district court to enjoin a state court proceeding in aid of its jurisdiction when it has retained jurisdiction over complex, in personam lawsuits. In Battle v. Liberty National Life Insurance Co., 877 F.2d 877 (11th Cir. 1989), we reviewed a district court order enjoining the plaintiffs in three state court proceedings from pursuing claims that were substantially similar to those claims settled by final judgment in a federal antitrust class action lawsuit. Battle was a complicated and protracted legal dispute between a funeral insurance provider and certain burial and/or vault insurance policy holders, in which the court certified two classes under Rule 23(b)(2) and 23(b)(3). After seven years of litigation in both state and federal court, the parties reached a settlement. "The final judgment established the rights and obligations of about 300 owners of some 400 funeral homes . . . and the rights . . . of approximately 1 million policyholders." Battle, 877 F.2d at 880. The court expressly retained jurisdiction over the case to resolve any future disputes amongst the settling parties regarding the settlement terms. Id. After entry of final judgment, three different sets of policyholders initiated other class actions in state court involving the issues the federal settlement had resolved.

We upheld the district court's permanent injunction of the state court proceedings because the "state court suits, class actions which on their face

challenge the propriety of the Battle judgment, can only undermine the district court's continuing jurisdiction over the case." Id. at 881. Put another way, contradictory state court judgments, purporting to bind substantially the same litigants on substantially similar claims, would only confuse the parties as to their legally enforceable rights and obligations. The purpose of the district court's judgment – to determine definitively the rights and obligations of the parties – would have been frustrated, and all of the time and effort put into producing that resolution wasted. We observed that "it makes sense" to consider so complicated a case, in which both the court and the parties had invested considerable time and resources, like a "res to be administered." Id. at 882.[36]

We reached the same conclusion in Wesch, a case involving an Alabama congressional redistricting plan administered by a three-judge court. After the

---

[36] Several other circuits share this view. See, e.g., In re Diet Drugs, 282 F.3d at 235 ("Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction."); Winkler v. Eli Lily & Co., 101 F.3d 1196, 1202 (7th Cir. 1996) ("We agree that the 'necessary in aid of jurisdiction' exception should be construed to empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory." (internal quotations omitted)); Newby v. Enron Corp., 338 F.3d 467, 474 (5th Cir. 2003) (upholding injunction that would "interfere with the multi-district court's ability to dispose of the broader action pending before it"); see also 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4225 (2d ed. 1988), at 531 (observing that there are cases, such as school desegregation suits and class actions, "that are not technically in rem but that seem analogous to the custody of property cases and in which the [in aid or jurisdiction] exception seems the soundest basis on which to allow an injunction").

court entered final judgment adopting the plan, a class action was filed in an Alabama circuit court on behalf of substantially the same plaintiffs asserting substantially the same claims as those before the district court. Wesch, 6 F.3d at 1468–69, 1470. The district court enjoined the state court proceedings in aid of its jurisdiction and to effectuate its judgment, and we affirmed. Relying on our reasoning in Battle, we concluded that the federal case should be treated like a res for Anti-Injunction Act purposes because "the three-judge district court . . . invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts." Id. at 1471. All of that effort would have been wasted if the state court proceedings were allowed to supplant the district court's final judgment. "To allow a system of redistricting at will would render all federal court redistricting plans, regardless of their validity, susceptible to immediate replacement by state court redistricting plans . . . and would effectively strip all federal courts of the ability to meaningfully redistrict." Id.

The exception recognized in Wesch and Battle is predicated on both complexity and potential for interference. The situation before us bears little factual similarity to those cases. We do not have before us a class action affecting the rights of hundreds (or even dozens) of parties, nor are we confronted with a

39

complex and carefully crafted settlement or other plan which would be undermined by a state court adjudication. The litigation in the Ohio court, on its own, would not displace or frustrate the district court's management of the case now pending before it. As compared to Battle and Wesch, the difficulties involved in resolving the Bayshore Action are different in kind and smaller in magnitude. Thus, the second exception to the Anti-Injunction Act does not apply.

B.

The district court's August 4, 2005 injunction also relied on the third exception to the Anti-Injunction Act "to protect or effectuate its judgment," 28 U.S.C. § 2283, i.e., its finding that the inherent antagonism amongst the Bayshore Class members made such a class, and its adequate representation by the Bayshore Dealers, impossible to certify. This exception, also known as the "relitigation exception," allows "a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." Chick Kam Choo, 486 U.S. at 147, 108 S. Ct. at 1690. It is essentially a preclusion concept, "founded in the well-recognized concepts of res judicata and collateral estoppel." Id. Finality is an essential element of both res judicata and collateral estoppel. J.R. Clearwater Inc. v. Ashland Chem. Co., 93 F.3d 176, 179 (5th Cir. 1996); see also In re Justice Oaks II, Ltd., 898 F.2d 1544, 1550 (11th Cir. 1990) (stating that

40

a "judgment must be final and on the merits" in order for res judicata to apply);

Christo v. Padgett, 223 F.3d 1324, 1339 (11th Cir. 2000) (recognizing finality as a

collateral estoppel requirement).

While res judicata requires a final judgment, we clarified in Christo that the

finality requirement for collateral estoppel is "less stringent." Christo, 223 F.3d at

1339. Christo involved a bankruptcy court proceeding filed by Christo's trustee in

bankruptcy against Padgett based on Padgett's alleged breach of an oral contract

to turn over control of a bank to the Christo family. In a separate, but related,

proceeding in the district court, the Christo family filed an action against Padgett

based on Padget's alleged breach of an oral contract to purchase the bank on the

family's behalf. After an evidentiary hearing, the district court issued an

interlocutory order pertaining to the bankruptcy proceeding, finding that no

enforceable oral agreement existed between Padgett and Christo or the Christo

family. The district court then dismissed the Christo family's breach of contract

suit based on collateral estoppel grounds. On appeal, the Christo family

contended that the interlocutory order lacked finality. We affirmed, stating that

collateral estoppel requires sufficient indicia of finality, but does not require the

"final judgment" needed for res judicata to apply.[37] Id. We held that the district court sufficiently indicated that its finding that there was no contract between the parties was final because it "considered a wide range of evidence from all concerned parties and wrote a substantial order in which it explained its findings," explicitly "put the parties on notice that the order could have preclusive effect," and "considered those findings final." Id.

By contrast, we do not find sufficient evidence of finality in the district court's denial of class certification in the Bayshore Action. Unlike Christo, no signals of finality were sent to the parties. The district court's order denying class certification made no indication of either the finality or the preclusive effect of its ruling, Ford has pointed to no such indication in the record, and our own review of the record has uncovered none. Importantly, Rule 23(c)(1) specifically empowers district courts to alter or amend class certification orders "at any time prior to a decision on the merits." Prado-Steiman v. Bush, 221 F.3d 1266, 1273 (11th Cir.

---

[37] Although our prior opinion in Justice Oaks II made the categorical assertion that "[a] court's order or judgment can never have any preclusive effect on future litigation unless that order or judgment constitutes a final decision on the merits," Justice Oaks II, 898 F.2d at 1549, we noted in Christo that Justice Oaks II involved a claim of res judicata, Christo, 223 F.3d at 1338. We accordingly treated its commentary, as applied to collateral estoppel, as dicta. Id. We likewise distinguished our previous decision in First Alabama Bank v. Parsons Steel, Inc., 825 F.2d 1475, 1481 n.5 (11th Cir. 1987), in which we stated that "[n]onappealable final orders are not entitled to collateral estoppel or res judicata effect." Christo, 223 F.3d at 1338 n.45.

2000) (emphasis in original).[38] Even though we refused Ford's request for a Rule 23(f) permissive appeal of the district court's order denying class certification, the district court retained the flexibility to change its position.[39] Id. at 1273–74.

The district court's rejection of the Dealers' motion for reconsideration of that order does nothing to alter our view. The district court specifically stated that it found no <u>legal</u> basis for reconsidering the order, but was silent as to whether a different <u>factual</u> basis could bring about a different result. In short, the court acknowledged that facts not previously brought to its attention might warrant a retreat from its earlier decision denying certification. Under these circumstances, it would be inappropriate for us to consider the court's finding of inherent class

---

[38] Rule 23(c)(1)(C) states: "An order under Rule 23(c)(1) may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).

[39] This case is readily distinguishable from <u>Bridgestone/Firestone, Inc.</u>, 333 F.3d 763 (7th Cir. 2003), on which the district court exclusively relied in enjoining the Bayshore Dealers, Westgate, and their counsel. In <u>Bridgestone/Firestone</u>, the Seventh Circuit acknowledged that "claim preclusion (res judicata) depends on a final judgment, [but] issue preclusion (collateral estoppel) does not." <u>Bridgestone/Firestone</u>, 333 F.3d at 767. Unlike the case at hand, the court was giving preclusive effect to its own judgment, not to the district court's order on class certification. Additionally, the court emphasized the extent to which both it and the district court had investigated the tenability of the nationwide class proposed by the plaintiffs. It ultimately found that its resolution of the issue (rejection of an unsustainable nationwide class) was "sufficiently firm" for collateral estoppel purposes. Id. Based on the facts of <u>Bridgestone/Firestone</u>, collateral estoppel finality attached to the court of appeal's decision, and then only after the court received briefing from both sides, heard argument from both sides, and published an opinion detailing its findings. Clearly, that is not the situation here. Moreover, the <u>Bridgestone/Firestone</u> panel did not address the district court's authority under Rule 23(f) to change its class certification order. The district court could have relied on <u>Bridgestone/Firestone</u> to issue an injunction against the Bayshore Dealers, Westgate, and their counsel only through an unwarranted extension of the holding of that case.

43

antagonism final for collateral estoppel purposes.[40]

Neither the "in aid of jurisdiction" nor the "to protect or effectuate its judgments" exceptions to the Anti-Injunction Act warranted the enjoining of the Westgate Action. These exceptions simply do not apply to the facts of this case. We must therefore conclude that the district court abused its discretion by halting the prosecution of the Westgate Action.

## C.

Determining that the district court lacked the authority to issue an injunction under the Anti-Injunction Act does not fully answer the question of whether the court erred in enjoining the Dealers' participation in the Westgate Class. The Anti-Injunction Act limits the court's ability to issue injunctions directed at

---

[40] We do not decide today whether an order denying class certification, as such, lacks finality for collateral estoppel purposes in every case. We have previously observed, however, that "[t]he refusal to allow a suit to be maintained as a class action does not normally constitute a final judgment." Seibert v. Great N. Dev. Co., 494 F.2d 510, 511 (5th Cir. 1974). We also point out that several circuits have adopted this position, concluding that class certification orders lack sufficient finality to be given preclusive effect under the relitigation exception of the Anti-Injunction Act. See Canady v. Allstate Ins. Co., 282 F.3d 1005, 1019 n.9 (8th Cir. 2002) ("We recognize that denial of class certification alone does not constitute a final judgment on the merits sufficient to satisfy the res judicata principles underlying the relitigation exception to the Anti-Injunction Act."); In re: Gen. Motors, 134 F.3d at 146 ("[D]enial of class certification is not a 'judgment' for the purposes of the Anti-Injunction Act while underlying litigation remains pending."); J.R. Clearwater, 93 F.3d at 179 ("[I]t seems apparent to us that the denial of class certification similarly lacks sufficient finality to be entitled to preclusive effect while underlying litigation remains pending. Because finality is central to the concepts of both res judicata and collateral estoppel, which animate the Anti-Injunction Act, such a lack of finality is also fatal to a request for injunction under the Act.").

"proceedings in a State court." 28 U.S.C. § 2283. However, the district court's order barring the Dealers from participating in the Westgate Action as members of the Westgate Class was not tantamount to halting the proceedings in the Ohio court. Given our holding that the district court erred under the Anti-Injunction Act in enjoining Westgate (and its counsel) from prosecuting its case, Westgate is now free to pursue it with or without the Dealers. If the district court had the authority to enjoin the Dealers from participating in the case as members of the Westgate Class, that authority existed apart from the Anti-Injunction Act; as we will discuss infra, the district court's only authority for such an injunction would have been under the All Writs Act.

Our analysis of the district court's injunction is complicated by the fact that the court failed to articulate the authority under which it enjoined the Dealers' participation in the Westgate Class. Instead, the court relied on the "reasoning and rationale" of Bridgestone/Firestone, Inc., 333 F.3d 762 (7th Cir. 2003). The Seventh Circuit in that case reversed the district court's certification of a nationwide plaintiffs' class, and held that the class could not be certified over the objection of the defendants, Ford and Firestone. Bridgestone/Firestone, 333 F.3d at 766. The plaintiffs responded by seeking class certification in several state court actions. This prompted Ford and Firestone to request an injunction under

45

the Anti-Injunction Act's relitigation exception. Id. at 765. The district court refused their request, and the Seventh Circuit reversed. Id. Although the court of appeals felt it necessary to protect its prior ruling by forestalling relitigation of an issue it had already decided, it ordered the district court to issue the injunction principally to prevent the proliferation of nationwide class actions identical to the one it rejected. Absent an injunction, the court anticipated that lawyers (including those appearing before it) would be emboldened to "fil[e] in as many courts as necessary until a nationwide class comes into being and persists." Id. Such relitigation would therefore "turn even an unlikely outcome into reality," making "it sensible to handle the preclusive issue once and for all in the original [in this instance, federal] case." Id.

It is reasonable to infer from the district court's reliance on Bridgestone/Firestone that the court suspected Westgate, the Dealers, and their counsel of employing the litigation strategy decried by the Seventh Circuit, and that it wanted to stop them by giving finality to its class certification denial. The district court's suspicion may or may not have been warranted, but the question remains whether Bridgestone/Firestone supplied an adequate justification for enjoining the Dealers from participating in the Westgate Class. We conclude that it did not.

The All Writs Act is the only source from which the district court could have derived the power to enjoin the Dealers.[41]  Under the Act, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.  The Act "is a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source."  Klay, 376 F.3d at 1099.  It allows federal courts "to protect their respective jurisdictions," and "to safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments."  Id. (internal quotes omitted) (citing Wesch, 6 F.3d at 1470 ("In addition, courts hold that despite its express language referring to 'aid . . . of jurisdiction,' the All Writs Act empowers federal courts to issue injunctions to

_____

 [41]  In Klay v. United Healthgroup, Inc., 376 F.3d at 1097, we identified "at least three different types of injunctions a federal court may issue."  The first is the "traditional" injunction, which must be based on a cause of action "for certain breaches of common law, statutory, or constitutional rights."  Id.  The injunction issued against the Dealers was not "predicated on a cause of action," id., nor did it seek to remedy the violation of any rights possessed by Ford.  This injunction type, therefore, does not apply.  The second type of injunction is a "statutory injunction," which is "available where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute."  Id. at 1098.  The only statute Ford cited, and on which the district court relied, was the Anti-Injunction Act, which, as we have explained, does not provide a legal basis for the injunction issued against the Dealers.  By contrast, the third type of injunction issued under the All Writs Act is not issued as part of the relief provided by a cause of action or pursuant to a statutory mandate.  "[T]o obtain an All Writs Act injunction," a party need only "point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior."  Id. at 1100.  Of these three, only those injunctions issued under the All Writs Act fit here.

47

protect or effectuate their judgments.")). While proceedings are pending, "a court may enjoin almost any conduct 'which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'" Klay, 376 F.3d at 1102 (quoting ITT Cmty. Dev. Corp. v. Barton, 569 F.2d 1351, 1359 (5th Cir. 1978)).

It is unclear how Bridgestone/Firestone, which endeavored to end the proliferation of state court class actions, related to the district court's ability to manage the Bayshore Action in the instant case. We note, first and foremost, that the Seventh Circuit in Bridgestone/Firestone was not concerned that multiple state class actions would pose a threat to the district court's management of the case before it. To the contrary, the Bridgestone/Firestone court emphasized that the plaintiffs had the right to pursue state court certification of statewide classes, even while the federal suit was pending. Bridgestone/Firestone, 333 F.3d at 766 (stating that "[s]tate courts are free to decide for themselves how much effort to invest in creating subclasses" and that "[its] opinion [rejecting the nationwide plaintiffs class] contemplated that states would certify narrower classes"). Clearly, the plaintiffs' simultaneous participation in multiple suits did not so affect the district court's ability to manage the case before it as to warrant an injunction. If anything, Bridgestone/Firestone led to the opposite conclusion.

48

The Seventh Circuit decision, therefore, did not provide a legal basis for the district court's issuance of the injunction against the Dealers. Moreover, the district court pointed to no circumstances, independent of those discussed in Bridgestone/Firestone, that would indicate how the Dealers' membership in the Westgate Class could pose a threat to its litigation of the Bayshore Action. Indeed, the court's injunctive order "did not even begin to explain" how its jurisdiction was, or could be, threatened by the conduct it enjoined. Klay, 376 F.3d at 1110. Thus, we conclude that the district court could not properly have based its injunction against the Dealers on the All Writs Act.

We need not dwell on whether the court could properly have enjoined the Dealers to protect or effectuate its decision denying class certification. As discussed in part III.B., the district court's decision lacked the finality needed for either collateral estoppel or res judicata effect, and could not serve as the basis for an injunction under the All Writs Act. We thus must conclude that the All Writs Act did not give the district court the authority to enjoin the Dealers from participating as unnamed class members in the Westgate Action and that the issuance of the injunction constituted an abuse of discretion.

D.

In sum, the district court's injunction of the Westgate Action, the Dealers,

49

and their counsel fell under neither the "in aid of jurisdiction" nor the "to protect or effectuate its judgments" exceptions to the Anti-Injunction Act. Moreover, the court lacked sufficient legal justification under the All Writs Act for preventing the Dealers from participating in the Westgate Action. Accordingly, the issuance of the injunctions constituted an abuse of discretion.

We further observe that, when placed in its proper perspective, the district court's denial of the Dealers' motion for class certification informed the putative class members that they would have to try their case somewhere else; it invited them to repair to another forum. Hence, in refusing to entertain their claims, the court implicitly indicated that it was not binding them to its judgment – specifically, its decision, and the bases thereof, denying the Dealers' motion for class certification. What we have before us, then, is not a judgment, but the explicit refusal to issue one. Permitting an injunction to lie under such circumstances would stand the Anti-Injunction Act on its head.[42]

---

[42] We need not consider whether the courts of Ohio would give preclusive effect to the district court's order denying class certification. See First Ala. Bank, 825 F.2d at 1479 ("Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act becomes applicable and federal courts must turn to state law to determine the preclusive effect of the state court's decision.") (quoting Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 524, 106 S. Ct. 768, 772, 88 L. Ed.2d 877 (1986)). We have answered, in the negative, the logically antecedent question of whether the district court resolved an issue with the finality required by the Anti-Injunction Act, i.e., whether the court had the power to issue the injunction in the first place. We would have had occasion to apply the Full Faith and Credit Act had we answered that question in the affirmative. It is likewise unnecessary for us to evaluate Ford's claim that Westgate and their counsel made misrepresentations to obtain class certification from the Ohio

50

**IV.**

In their petition for writ of mandamus, the Bayshore Dealers assert that the

district court abused its discretion when it denied their Rule 41(a)(2) motion to

dismiss their case. The Dealers believe that this decision, coupled with the

injunction barring them from participating in the Westgate Action, has effectively

forced them to "opt-out" of the Westgate Class. This result, they contend, has

denied them of their substantive due process right to participate in the Westgate

Action.

It is well settled that a writ of mandamus is a drastic remedy confined to rare

situations. See Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 35, 101 S. Ct.

188, 190, 66 L. Ed. 2d 193 (1980) ("Only exceptional circumstances, amounting to

a judicial usurpation of power, will justify the invocation of this extraordinary

remedy."); In re BellSouth Corp., 334 F.3d 941, 954 (11th Cir. 2003) ("Mandamus

is an extraordinary remedy requiring demonstrable injustice or irreparable

injury."). Courts are reluctant to issue the writ due to the potential for abuse:

"Mandamus is not to be used as a subterfuge to obtain appellate review that is

otherwise foreclosed by law." BellSouth, 334 F.3d at 951.

To foreclose the argument that it constitutes an abuse of the writ, the

---

court, or whether the court's injunction order violated the Rooker-Feldman doctrine.

51

mandamus petition must satisfy three conditions. First, because the entry of a final judgment must ordinarily precede appellate review, the petitioner must demonstrate that "no other adequate means" exists to obtain the relief desired. Kerr v. U.S. Dist. Ct. for N.D. Calif., 426 U.S. 394, 403, 96 S. Ct. 2119, 2124, 48 L. Ed. 2d 725 (1976). Second, the petitioner must demonstrate a "clear and indisputable right" to the issuance of the writ. See BellSouth, 334 F.3d at 953–54 ("Significantly, a party is not entitled to mandamus merely because it shows evidence that, on appeal, would warrant reversal of the district court."); United States v. Denson, 603 F.2d 1143, 1147 n.2 (5th Cir. 1979) ("[T]he writ will not issue to correct a duty that is to any degree debatable: the trial court must be acting beyond its jurisdiction or in a fashion about which discretion is denied it."). Third, the issuing court must be persuaded that issuing the writ is within its discretion. Kerr, 426 U.S. at 403.

Given the record before us, we cannot conclude that the Dealers have surmounted the requisite hurdles for mandamus relief. Were the Dealers to await the entry of final judgment in their case, an appeal of that judgment would provide them with an altogether adequate means of relief. In their petition, the Dealers articulate two main arguments for the necessity of mandamus relief: (1) the denial of their motion to dismiss forceclosed their substantive due process right to

participate as unnamed class members in the Westgate Action; and (2) judicial economy. As for the due process argument, we have already determined that neither the Anti-Injunction Act nor the All Writs Act provided the district court with the authority to enjoin the Dealers from participating in the Westgate litigation, and so they are now free to do so. Thus, we need not consider whether the Due Process Clause of the Fifth Amendment grants them a substantive right to litigate their claims in an Ohio state court.

Moreover, principles of judicial economy do not convince us that the Dealers lack adequate alternative relief. "The mere possibility that a litigant might have to re-litigate a case is not a sufficiently compelling interest to warrant immediate review." BellSouth, 334 F.3d at 954; see Maloney v. Plunkett, 854 F.2d 152, 154–55 (7th Cir. 1988) ("[I]nconvenience, lost time, and sunk costs of such further proceedings . . . are not considered the kind of irremediable harm that will satisfy the stringent requirements for issuing a writ of mandamus."). Both the district court and the parties have invested seven years in litigating the Bayshore Action; dozens of orders have been issued in response to dozens of motions filed by the parties, including motions for summary judgment. Both sides have engaged in substantial discovery in the form of depositions, interrogatories, and thousands of pages of documents. The court has held a pretrial conference, and has set a trial

53

date. Indeed, judicial economy points us in a direction wholly contrary to the Dealers' position. An appeal of the final judgment in this case would not strip the Dealers of their right to appellate review of the denial of their Rule 41(a)(2) motion to dismiss.

Not only do the Dealers retain adequate alternative relief, they fail to satisfy the second condition for mandamus relief, a "clear and indisputable right" to the issuance of the writ. The decision to grant or deny a Rule 41(a)(2) motion to dismiss an action without prejudice is entrusted to the sound discretion of the district court; thus, a plaintiff holds no right to such dismissal. Fisher v. P.R. Marine Mgmt., Inc., 940 F.2d 1502, 1503 (11th Cir. 1991). What is more, in exercising its discretion, the court must "keep in mind the interests of the defendant, for Rule 41(a)(2) exists chiefly for protection of defendants." Id. at 1503.

Though it is advisable for district courts to share their reasons for denying Rule 41(a)(2) motions to dismiss in writing, both for the benefit of the parties and for the court of appeals on review, the district court did not do so here. Nevertheless, the record demonstrates that the denial was not, and could not have constituted, an abuse of discretion. If nothing else, that the parties' extensive discovery had concluded and the case was ready for trial counseled the denial of

the Dealers' motion.

## V.

Finally, we consider the Dealers' challenge to the district court's decision to exclude the report prepared by Fred A. Kinder. The Dealers designated Kinder as their expert witness on the damages issues, and he prepared a report which they described as a Federal Rule of Evidence 1006 summary of Ford's voluminous Heavy/Medium Truck pricing data. After holding a <u>Daubert</u> hearing, the court concluded that Kinder did not meet the expert witness requirements set out in Federal Rule of Evidence 702 and thus was unqualified to testify as an expert witness.[43] The district court therefore struck Kinder as an expert witness in an order dated July 28, 2005. The order did not address whether the Kinder Report would be admissible at trial, and Ford subsequently moved to strike it. The court

---

[43] In coming to its decision, the court found that:
"Mr. Kinder has no college degree, is not a certified public accountant, accountant, or economist. He is not versed in general accepted accounting principles, nor is he trained in statistics or statistical analysis. He has no training in heavy truck retailing or pricing, and he never spoke with any persons connected to the plaintiffs except their attorneys. In preparing his damages model, Mr. Kinder did not consult any treatise, nor did he consult with any expert in the industry about pricing procedures. Additionally, Mr. Kinder never referred to the franchise agreement which forms the basis for the plaintiffs' claim for damages. Indeed, Mr. Kinder himself, when asked about his expert status, stated that he was an expert in the "[h]andling of voluminous data with computer databases" and with "[a]nything to do with computers."
In addition, the court found that Kinder's damages model was based principally on the Dealers' previously dismissed Robinson-Patman Act claims, not the remaining breach of contract claims, and ignored differences in truck configurations, such as engine horsepower rating and tire type, that could have accounted for the different prices Ford charged the Dearlers for its trucks.

55

granted Ford's motion in the same August 4, 2005 order that enjoined further prosecution of the Westgate Action. The court did so because it found that the report consisted of two models, both created by Kinder and based on his assumptions, purporting to show how the Dealers' damages could or should have been calculated, and that, as such, the report was not a mere summary of data and thus was inadmissible under Rule 1006.

As a threshold matter, Ford submits that we should not review the district court's decision for two reasons. First, the Dealers failed to preserve the issue for appeal because their Notice of Appeal only mentioned the injunctive part of the August 4 order. The Dealers respond that they mentioned the injunction, as opposed to the report's exclusion, to indicate the jurisdictional basis for its right of appeal, under 28 U.S.C. § 1291(a)(1). The Dealers claim, additionally, that "subsequent filings in this Court by both parties make it plain that the Dealers appealed from the Order excluding the summary report and that Ford knew the summary report might well be an issue on appeal." Second, we lack pendent appellate jurisdiction even if we treat the Dealers as having preserved the Kinder Report issue for appeal. The Dealers respond that the report is sufficiently related to the injunction to warrant a review of its exclusion. We need not decide whether the Dealers preserved the Kinder Report exclusion for appeal because, as Ford

contends, we lack the jurisdiction to review it.

Although the August 4 ruling is not a final judgment, see 28 U.S.C. § 1291, it is an injunction, appealable under § 1292(a)(1). Section 1292(a)(1) gives the courts of appeals jurisdiction to review interlocutory orders, specifically "interlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1).[44] The court's order striking the Kinder Report is neither final under § 1291, nor listed as an appealable interlocutory order under § 1292(a). This does not mean, however, that such decisions are never subject to appeal. If an otherwise nonappealable interlocutory order is "inextricably intertwined" with or "necessary to ensure meaningful review" of an injunctive order, we may review it under our pendent appellate jurisdiction. See Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000) (quoting Summit Med. Assoc., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir.1999) ("Under the pendent appellate jurisdiction doctrine, we 'may address [otherwise] nonappealable orders if they are "inextricably intertwined" with an appealable decision or if "review of the former decision [is] necessary to ensure meaningful review of the latter."")). It is on this basis that the

---

[44] Section 1292(a) also allows immediate appeal of orders "appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof," and orders "determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." See 10 Wright, Miller & Kane, supra, § 2658.1, at 83.

Dealers ask us to review the court's decision.

The Dealers turn to our decision in Cable Holdings of Battlefield Inc. v. Cooke, 764 F.2d 1466, 1472 (11th Cir. 1985) for support. In Cooke, we reviewed under § 1292(a)(1) the district court's denial of the plaintiff's motion for a preliminary injunction, and its dissolution of a preliminary restraint. The plaintiff claimed that we also had pendent appellate jurisdiction over the court's grant of partial summary judgment to the defendants, an interlocutory order not listed in § 1292, because that order was inextricably intertwined with the injunction orders. We observed that "in reviewing interlocutory injunctions we may look to otherwise nonappealable aspects of the order," id. at 1472 (quoting Gould v. Control Laser Corp., 650 F.2d 617, 621 n.7 (5th Cir. 1981)), and concluded that "the grant of partial summary judgment in favor of the three defendants was the basis for both the dissolution of the preliminary restraint and the denial of the preliminary injunction." Id. Stated another way, the otherwise unreviewable grant of partial summary judgment directly provided the underlying support for the court's injunction orders. We could not properly have reviewed the injunctive orders without also looking to the grant of partial summary judgment.

The situation we faced in Cooke bears no similarity to the one we consider here. The court made neither direct nor oblique reference to the Kinder Report

58

when discussing its decision to issue the injunction. The report, which purports to summarize Ford's voluminous truck pricing data and to calculate the damages caused the Dealers by Ford's CPA program, has nothing to do with the issues of jurisdiction, federalism, and judicial economy that animated the district court's injunctive order. It is therefore difficult to imagine how the report played any part in issuing the injunction, let alone provided the justification for doing so.

The Dealers, for their part, do little to shed light on this mystery. They merely assert that the court's order excluding the Kinder Report "concern[s] certain evidentiary issues that . . . would further judicial economy and orderly judicial administration." They do not identify those evidentiary issues, and they do not explain how the resolution of those issues would facilitate the district court's efficient management of the case. Pendent appellate jurisdiction cannot be founded on such vague and conclusory assertions. We accordingly conclude that the court's decision to exclude the Kinder Report is not inextricably intertwined with its injunctive order, and that revisiting that ruling does nothing to ensure meaningful review of the injunction.

## VI.

In conclusion, we hold that the district court lacked authority under the Anti-Injunction Act to enjoin further prosecution of the Westgate Action, and that

59

it lacked the authority under the All Writs Act to enjoin the Dealers and their counsel from participating in that case. The injunction is accordingly **VACATED.** Moreover, because an appeal from an adverse final judgment would provide the Dealers an adequate means for obtaining review of the district court's denial of their motion to dismiss the Bayshore Action, and the district court did not abuse its discretion in so ruling, the Dealers' petition for a writ of mandamus is **DENIED.** Finally, we lack pendent appellate jurisdiction to review the district court's exclusion of the Kinder Report.

The case is **REMANDED** for further proceedings not inconsistent with this opinion.

**SO ORDERED.**