JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Ford Motor Company appeals from an order that certified as a class all franchised Ford heavy truck dealers operating in the United States who purchased medium and heavy trucks from Ford between October 5, 1987 to present. The court appointed plaintiff-appellee Westgate Ford Truck Sales, Inc., as the class representative. Ford appeals, arguing that the court abused its discretion by granting class certification because (1) it refused to give preclusive effect to federal court litigation on the same class certification issue and (2) Westgate did not demonstrate the Civ.R. 23 prerequisites for class certification. We conclude that the federal court proceedings did not adjudicate any issues against Westgate in a manner that would have preclusive effect. We also conclude that the court did not abuse its discretion by deciding that Westgate demonstrated the necessary factors for class certification. We affirm the class certification order.
 {¶ 2} The procedural facts are undisputed. The Westgate plaintiffs are Ford medium and heavy truck dealers[1] (Ford Series 600 trucks and higher) aggrieved by Ford Motor Company's Competitive Price Assistance ("CPA") program.
 {¶ 3} The medium and heavy truck market differs from the retail automobile market because medium and heavy trucks tend to be special order trucks and are infrequently bought from existing inventory. Customers may present a list of specifications to the dealer, and often seek bids from competing dealers to obtain *Page 5 
the best price. The CPA program permitted truck dealers to petition Ford for discounts or concessions off the wholesale price of trucks in order to meet prices established by competitors.
 {¶ 4} There were two components to the CPA program. Ford made the first component, "Sales Advantage" CPA, available to all of its truck dealers. That component is not at issue in this litigation. A second component, called "Appeal Level" CPA entitled dealers with a demonstrated need to petition Ford for additional concessions on a case-by-case basis. To obtain an appeal level concession, dealers were required to submit pricing information, including desired profit on a vehicle. Ford utilized its own criteria for awarding such concessions, and did so in its sole discretion and without informing other dealers of the amount of the concession.
 {¶ 5} In 1999, Bayshore Ford Truck Sales, Inc. and four other Ford truck dealers (the "Bayshore Dealers") brought suit against Ford in the United States District Court for the Northern District of Georgia. The Bayshore dealers complained that the CPA program violated paragraph 10 of Ford's standard franchise agreement.[2] The dealers alleged that Ford violated the franchise agreement by (1) *Page 6 
failing to publish in advance to the dealers all prices on trucks and replacement parts and (2) failing to sell all trucks and replacement parts to the dealers only at those published prices. The dealers further alleged that Ford artificially inflated the price of its trucks and then used the appeal level CPA to control dealer profits and enhance Ford revenue. They also alleged that the concessions were applied unevenly to dealers, with Ford granting preferential concessions to some dealers at the expense of others.
 {¶ 6} The complaint also alleged violations of the Robinson-Patman Act, Section 13, Title 15, U.S. Code, which forbids any person or firm engaged in interstate commerce to discriminate in price to different purchasers of the same commodity when the effect would be to lessen competition or to create a monopoly.
 {¶ 7} The Bayshore dealers asked the district court to certify as a class: *Page 7 
 {¶ 8} "All franchised Ford dealers within the jurisdiction of this Court who ordered and purchased from Ford any Ford Medium/Heavy Truck during the model years 1990-1998. The term `Medium/Heavy Truck' is defined to be a truck classified by Ford with the designation F-600 or above."
 {¶ 9} The district court denied class certification in September 2000, finding that the dealers could not adequately represent the class. The court noted that the claims made concerning favored/unfavored treatment under the appeal level CPA necessarily meant that some dealers had been treated differently than others. This meant that some of the dealers who would be incorporated into the class might have antagonistic interests because some dealers might have profited at the expense of other dealers, thus defeating the commonality requirement.
 {¶ 10} After the court granted summary judgment on the substantive issues to Ford in May 2003, the dealers appealed to the United States Court of Appeals for the Eleventh Circuit. They included the denial of class certification as an issue in their notice of appeal, but did not brief that issue to the court of appeals. The court affirmed the summary judgment in part and reversed it in part. See Bayshore Ford Truck Sales,Inc. v. Ford Motor Company (C.A.11, 2004), 380 F.3d 1331.
 {¶ 11} In October 2001, three dealers filed an action against Ford in a Pennsylvania court of common pleas. Their complaint asserted a single breach of contract claim for relief stemming from the CPA, but did not assert a *Page 8 
Robinson-Patman Act claim as in the Bayshore litigation. See HublerCorp. v. Ford Motor Co., Bucks County Court of Common Pleas, No. 01006427-25-1.
 {¶ 12} In October 2002, Westgate filed in the Cuyahoga County Court of Common Pleas the complaint at issue here, likewise raising a breach of contract claim stemming from the CPA. As a result of theWestgate filing, the Hubler plaintiffs dismissed their action and joined in the Westgate action. The allegations of the Westgate complaint mirrored in substance the allegations of the Hubler case, which in turn mirrored the contract claims set forth in Bayshore.
 {¶ 13} Westgate subsequently asked the court to certify as a class "[a]ll franchised Ford Dealers operating in the United States who purchased from Ford any truck of series 600 and above (Medium/HeavyTruck) in the time period commencing on October 5, 1987 to the present." (Emphasis sic.)
 {¶ 14} Ford objected to class certification on grounds that the plaintiffs were collaterally estopped from seeking certification based on the federal court's September 2000 refusal to certify the same class in the Bayshore case. It cited to In re Bridgestone/Firestone, Inc. TireProduct Liability Litigation (C.A.7, 2003), 333 F.3d 763, in which the United States Court of Appeals for the Seventh Circuit held that a district court should have granted an injunction to prohibit class plaintiffs who had been denied class certification in federal court from seeking the same in identical state court filings. *Page 9 
 {¶ 15} The common pleas court granted class certification. As relevant to the collateral estoppel issue raised on appeal, the court found thatBridgestone/Firestone did not control. It noted that theBayshore court denied class certification based on the Robinson-Patman Act allegations and the possibility that some members of the class would, as alleged in the complaint, have benefitted from Ford's use of the CPA to the detriment of other members of the class. The court noted that the single breach of contract claim filed by the Westgate plaintiffs did not invoke the same concerns — all putative members of the class would have the same interests in the complaint since there would be no issue under the Robinson-Patman Act concerning favorable/unfavorable treatment as alleged in Bayshore.
 {¶ 16} The pendency of the Ohio litigation did not end the federal court litigation in Georgia. In the wake of the federal court's order denying class certification on the Robinson-Patman Act claim, the Bayshore plaintiffs dismissed that claim for relief, leaving only the contract claim. The district court granted summary judgment to Ford on the Bayshore plaintiffs' breach of contract claim. The Bayshore plaintiffs appealed from the summary judgment, and the Eleventh Circuit Court of Appeals reversed in part. Bayshore Ford Truck Sales, Inc. v.Ford Motor Co. (C.A.11, 2004), 380 F.3d 1331. The court of appeals held that language in paragraph 10 of the franchise agreement could be subject to different interpretations such that judgment could not be rendered as a matter of law. Id. at 1336-1337. *Page 10 
 {¶ 17} One week after Ford perfected the appeal in this case, the Bayshore plaintiffs sought permission under Fed.R.Civ.P. 41(a)(2)[3]
to voluntarily dismiss their contract claim "in order to participate in the Westgate Action as unnamed class members." Ford then petitioned the federal court in Georgia to issue an injunction pursuant to the Anti-Injunction Act, Section 2283, Title 28, U.S. Code, to enjoin the Ohio court from enforcing its class certification order. The motion detailed the litigation between the parties as described above, and asked the district court to enter an injunction against (1) the named and unnamed members of the national class referred to in the district court's September 2000 order denying class certification and (2) attorney James A. Pikl, who represented the Westgate (as well as the Bayshore and Hubler) plaintiffs. Ford argued that the court's class certification in the Westgate action undermined the district court's ability to enforce its order denying certification of the same proposed class.
 {¶ 18} The Westgate plaintiffs sought and were granted permission to intervene in the federal court for the sole purpose of opposing Ford's request for an injunction. The district court then denied Bayshore's motion to dismiss the complaint. The following day, it granted Ford's request for an injunction, finding that: *Page 11 
 {¶ 19} "This court's order [denying class certification] pertained both to the plaintiffs' Robinson-Patman claims and to the plaintiffs' breach of contract claims. The plaintiffs had not sought certification of different classes for their different claims, and this court considered all claims asserted by the plaintiffs when it denied their motion for class certification. The Ohio court's statement to the contrary is simply wrong."
 {¶ 20} The district court went on to enjoin plaintiffs and their lawyers "from again attempting to have a nationwide class certified and from further prosecuting any nationwide class certified over the defendant's objections with respect to the same class and claims alleged in this case."
 {¶ 21} The injunction applied in two respects. First, it enjoined Westgate's prosecution of the Westgate action in Ohio under the Anti-Injunction Act. Second, it enjoined the dealers from participating in the Westgate action as unnamed class members under the All Writs Act, Section 1651(a), Title 28, U.S.Code.
 {¶ 22} Bayshore and Westgate appealed to the Eleventh Circuit. The Eleventh Circuit stayed the district court's injunction pending resolution of the appeal. We, in turn, stayed this appeal pending resolution of the issues by the Eleventh Circuit.
 {¶ 23} The Eleventh Circuit vacated the district court's injunction inIn re Ford Motor Co. (C.A.11, 2006), 471 F.3d 1233. It found that the district court erred by permitting the Westgate dealers to intervene in the Bayshore action because its only purpose in doing so was to challenge the application of the injunction in the state *Page 12 
court action; nevertheless, because the Westgate dealers invited the error by seeking to intervene, the district court properly exercised personal jurisdiction over them. Id. at 1245-1249. The circuit court held that there was insufficient evidence of finality in the district court's denial of class certification to indicate that the district court considered it final or preclusive for purposes of a subsequent state court action. Id. at 1253-1254.
 {¶ 24} The Eleventh Circuit noted that the district court's order effectively constituted two injunctions: one under the Anti-Injunction Act for enjoining Westgate's prosecution of the Westgate action in Ohio and one under the All Writs Act for enjoining the Bayshore plaintiffs from participating in the Westgate action.
 {¶ 25} Analyzing the issue under the Anti-Injunction Act,[4] the Eleventh Circuit found that none of the exceptions applied. Of particular interest to this appeal, it held that the third exception, sometimes called the "relitigation exception," did not apply because it did not find "sufficient evidence of finality in the district court's denial of class certification in the Bayshore Action." Id. at 1253-1254. Because federal rules specifically empower a district court to alter or amend class certification "at any time prior to a decision on the merits," see Fed.R.Civ.P. 23(C)(1), the district court could, absent any indication of finality to the parties, have amended or altered *Page 13 
its order denying class certification. The Eleventh Circuit found that the district court's right to amend the order denying class certification remained even though the district court had denied the Bayshore plaintiffs' motion to reconsider and the Eleventh Circuit had refused the Bayshore plaintiffs' request pursuant to Fed.R.Civ.P.23(f)[5] for a permissive appeal on the district court's refusal to certify the class. Id. at 1254.
 {¶ 26} In reaching this conclusion, the Eleventh Circuit distinguished the Seventh Circuit's decision in Bridgestone/Firestone, the case relied upon by the district court to enjoin the Westgate and Bayshore plaintiffs and their counsel. The Eleventh Circuit noted that inBridgestone/Firestone the Seventh Circuit gave preclusive effect to its own judgment, not to the district court's order on class certification. Id. at 1254, fn.39. The Eleventh Circuit went on to note:
 {¶ 27} "Additionally, the court emphasized the extent to which both it and the district court had investigated the tenability of the nationwide class proposed by the plaintiffs. It ultimately found that its resolution of the issue (rejection of an unsustainable nationwide class) was `sufficiently firm' for collateral estoppel purposes. Id. Based on the facts of Bridgestone/Firestone, collateral estoppel *Page 14 
finality attached to the court of appeal's decision, and then only after the court received briefing from both sides, heard argument from both sides, and published an opinion detailing its findings. Clearly, that is not the situation here. Moreover, the Bridgestone/Firestone panel did not address the district court's authority under Rule 23(f) to change its class certification order. The district court could have relied onBridgestone/Firestone to issue an injunction against the Bayshore Dealers, Westgate, and their counsel only through an unwarranted extension of the holding of that case." Id.
 {¶ 28} The Eleventh Circuit expressly did not decide whether "an order denying class certification, as such, lacks finality for collateral estoppel purposes in every case." Id., fn. 40.[6] However, it noted that under federal law the refusal to allow a suit to be maintained as a class action is not normally a final judgment which could be considered to have preclusive effect to satisfy res judicata principles. Id. Without such finality, the order denying class certification could not be preclusive; hence, the district court's injunction could not purport to effectuate a judgment. The Eleventh Circuit found that "Westgate is now free to pursue [the Westgate action] with or without the Dealers." Id. at 1255.[7] *Page 15 
 I {¶ 29} In its first assignment of error, Ford argues that the court erred by refusing to collaterally estop Westgate from seeking class certification when certification on the exact same claims for relief had been denied by the federal court in Bayshore. It maintains that contrary to the court's findings, the district court in Bayshore did resolve the certification issue as it related to the breach of contract claim, citing the district court's statements to that effect when granting the injunction.
 {¶ 30} As previously stated, we stayed hearing this appeal until the Eleventh Circuit resolved the issues underlying the injunction relating to the Westgate plaintiffs in In re Ford. As detailed above, that opinion establishes that the district court order denying class certification gave "no indication of either the finality or the preclusive effect of its ruling, Ford has pointed to no such indication in the record, and our own review of the record has uncovered none."In re Ford, 471 F.3d at 1254.
 {¶ 31} In O'Nesti v. DeBartolo Realty Corp., 113 Ohio St.3d 59, 2007-Ohio-1102,1J6-7, the supreme court explained the concepts of res judicata and collateral estoppel:
 {¶ 32} "The doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel. Claim *Page 16 
preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action. Where a claim could have been litigated in the previous suit, claim preclusion also bars subsequent actions on that matter.
 {¶ 33} "Issue preclusion, on the other hand, serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies. Issue preclusion applies even if the causes of action differ." Id.
 {¶ 34} Collateral estoppel cannot apply unless a "fact or point" has been determined by a court of competent jurisdiction. The Eleventh Circuit made it clear that the Bayshore issue of class certification remained an open question under federal law because (1) the district court retained the discretion to revist its ruling under Fed.R.Civ.P. 23
and (2) the district court gave no indication of finality or preclusive effect to its ruling. Since the district court's denial of class certification in the Bayshore litigation is not final in that action, that order can have no preclusive effect on the parties in theWestgate action.
 {¶ 35} We recognize that had the denial of class certification been made under Ohio law, that denial would be a final order and potentially preclusive among parties in privity. See Rehoreg v. Stoneco, Inc., Lorain App. No. 04CA008481, 2005-Ohio-12 (denial of class certification is a final order which has preclusive effect over a *Page 17 
second motion for class certification). Nevertheless, the federal court's order was undeniably non-final and thus could not have preclusive effect. The district court's refusal to certify a class lacked the kind of finality necessary for application of collateral estoppel by an Ohio court.
 II {¶ 36} In its second assignment of error, Ford complains that the court made four separate "findings on the merits" of the complaint when ruling on the motion for class certification. These "findings" relate to recitations of fact concerning paragraph 10 of the franchise contract and the application of the CPA program. It argues that such findings were premature and must be reversed.
 {¶ 37} Despite the actual language used in its assignment of error, Ford acknowledges that it is not clear whether the court intended these "findings" to be "actual dispositive findings on the merits." We do not believe that these statements were intended to resolve contested factual or legal issues. Importantly, the court prefaced its factual recitation by stating "according to Westgate." We view this phrase as showing that the court restated the facts as alleged by the Westgate plaintiffs. We do not view this language as indictating or implying that the court made any factual or legal determination on the merits, apart from those issues relating to the motion to certify a class. The assignment of error is overruled.
 III *Page 18 {¶ 38} Ford's third, fourth and fifth assignments of error are interrelated in that it claims the court abused its discretion by finding that the Westgate plaintiffs satisfied Civ.R. 23 requirements for commonality, typicality, predomination of common questions, and whether Westgate is an adequate class representative. We address these issues in turn.
 A. {¶ 39} In Hansberry v. Lee (1940), 311 U.S. 32, 42, the United States Supreme Court stated:
 {¶ 40} "The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable. Courts are not infrequently called upon to proceed with causes in which the number of those interested in the litigation is so great as to make difficult or impossible the joinder of all because some are not within the jurisdiction, or because their whereabouts is unknown, or where if all were made parties to the suit its continued abatement by the death of some would prevent or unduly delay a decree. In such cases where the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation of the issues in which all have a common interest, the court will proceed to a decree." *Page 19 
 {¶ 41} These principles were codified in Civ.R. 23(A), which permits the courts to group into classes large numbers of persons whose claims for rights or remedies involve common questions of law and fact. InState ex rel. Davis v. Public Emp. Retirement Bd., 111 Ohio St.3d 118,2006-Ohio-5339, the supreme court cited to Hamilton v. Ohio Sav.Bank (1998), 82 Ohio St.3d 67, 71, 1998-Ohio-365, and stated at T|21:
 {¶ 42} "The parties seeking class certification must establish the following seven requirements before an action may be maintained as a class action under Civ.R. 23: `(1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be met.'"
 {¶ 43} Class certification is discretionary with the court. As an appellate court, we are cautioned that we must give due deference to the court's decision, and that any determination as to whether a class action may be maintained can only be reversed for an abuse of discretion. Marks v. C.P. Chem. Co. (1987), 31 Ohio St.3d 200, syllabus.
 B. Commonality *Page 20 {¶ 44} In Warner v. Waste Mgmt, Inc. (1988), 36 Ohio St.3d 91, 97, the supreme court stated:
 {¶ 45} "Courts generally have given a permissive application to the commonality requirement in Civ. R. 23(A)(2). See Marks v. C. P. ChemicalCo. (1987), 31 Ohio St. 3d 200, 31 OBR 398, 509 N.E. 2d 1249. This prerequisite has been construed to require a `common nucleus of operative facts.' Marks, supra, at 202, 31 OBR at 400,509 N.E. 2d at 1253. Professor Miller indicates:
 {¶ 46} "`If there is a common liability issue, [Fed.R.Civ.P.] 23(a)(2) is satisfied. Similarly if there is a common fact question relating to negligence, or the existence of a contract or its breach, or a practice of discrimination, or misrepresentation, or conspiracy, or pollution, or the existence of a particular course of conduct, the Rule is satisfied. Typically, the subdivision (a)(2) requirement is met without difficulty for the parties and very little time need be expended on it by the * * * judge.'" (Footnote and internal quotations omitted.)
 {¶ 47} Although the commonality requirement is usually met without difficulty, "it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." Schmidt v. Avco Corp. (1984),15 Ohio St.3d 310, 313.
 {¶ 48} The court found that Westgate established the element of common questions of law and fact, stating: *Page 21 
 {¶ 49} "Here, plaintiff alleges that every member of the class incurred damages because Ford breached a standard provision in its franchise agreements. Therefore, the question of Ford's liability is common to all the members of the class proposed by plaintiff."
 {¶ 50} Ford first argues that the court erred by finding that the Westgate plaintiffs established the commonality requirement. It maintains that the court simply parroted the allegations of Westgate's complaint relating to paragraph 10 of the franchise agreements by failing to publish appeal level CPA prices, even though the class representative had denied that Ford had a duty to publish to all of its dealers the amount of appeal CPA that it gave to any dealer.
 {¶ 51} There is no question that each dealer signed a Ford franchise agreement which contained paragraph 10. The claims arising under the appeal level CPA are common to all members of the class insofar as they were bound by the terms of paragraph 10 and used the appeal level CPA.
 {¶ 52} Having so concluded, we acknowledge that Thomas Beule, the owner and president of Westgate Ford Truck Sales, Inc., testified at deposition and replied "no" to the question of whether it was his position that "Ford was required to publish to all dealers the amount of appeal CPA it gave to any dealer." This negative response directly contradicted paragraph 65 of Westgate's complaint in which it alleged that "Ford materially breached the terms of the FranchiseAgreements with all Class Members by failing and refusing topublish all Appeal-Level CPA prices *Page 22 
and discounts in accordance with Paragraph 10 of the FranchiseAgreements.'" (Emphasis sic.) Ford maintains that there can be no commonality when the lead plaintiff does not support the threshold issue raised in the class action complaint.
 {¶ 53} In Baughman v. State Farm Mut. Auto. Ins. Co.,88 Ohio St.3d 480, 478, 2000-Ohio-397, the supreme court stated "we too are convinced that, absent some serious discrepancy between the position of the representative and that of the class, the focus at this stage of the proceedings should properly remain on the essential conforming characteristics of the defendant's conduct and the claims arising therefrom."
 {¶ 54} Westgate explained Beule's response by noting that it was a one-off answer given in the course of a three-day deposition. The record supports this characterization of Beule's response. He testified in other parts of his deposition that he believed the appeal level CPA constituted a violation of paragraph 10 of the franchise agreement. Beule's deposition, read in context, fails to show that he maintained a position in the litigation that was seriously discrepant with that of the other class members. Given the low threshold required to show commonality and Beule's other responses which were consistent with the claims set forth in the complaint, we are unable to conclude that one misstatement in an 800 page deposition constitutes a repudiation of a party's entire action sufficient to show a lack of commonality.
 C. Typicality *Page 23 {¶ 55} To determine typicality, the courts look to see whether the class representatives' claims appear substantially similar to the claims of the other class members. This inquiry "serves the purpose of protecting absent class members and promoting the economy of class action by ensuring that the interests of the named plaintiffs are substantially aligned with those of the class." Baughman v. State FarmMut. Ins. Co., 88 Ohio St.3d 480, 2000-Ohio-397, at 484, citing 5 Moore's Federal Practice (3 Ed.1977) 23-92 to 23-93, Section 23.24[1]. Like the Civ.R. 23 requirement of commonality, the test for typicality is not demanding. Nevertheless, this requirement "`must be taken seriously and cannot be satisfied solely by conclusory allegations.'" Id., quoting 7A Wright, Miller Kane, Federal Practice Procedure (2 Ed.1986) 234-235, Section 1764.
 {¶ 56} Ford's argument against typicality merely restates the same argument it made in contesting commonality — that Westgate's representative, Beule, made admissions during his deposition that contradicted the class complaint. We rejected Ford's earlier argument on the basis that it relied on obvious misstatements by Beule, and that analysis applies with equal force here. As stated by 1 Newberg on Class Actions (3 Ed.1992) 3-74 to 3-77, Section 3.13:
 {¶ 57} "The rationale for [typicality] is that a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with those of the representative. *Page 24 
In such a case, the adjudication of the plaintiff's claim regarding defendant's wrongdoing would require a decision on the common question of the defendant's related wrongdoing to the class generally."
 {¶ 58} Ford concedes the claim arises under paragraph 10 of the franchise agreement. All dealers were subject to that provision. The contract claim of the class action complaint is therefore typical for all members of the class.
 D. Adequate Class Representative {¶ 59} Ford argues that Westgate is not an adequate class representative because (1) its class claims are inherently antagonistic, (2) it contradicts the basic elements of the class claim, and (3) it is uniformed about the basic elements of the class claim.
 {¶ 60} The authorization of a class representative can only by made under Civ.R. 23(A)(4) upon a showing that the representative will "fairly and adequately" protect the interests of the class. Implicit in the concept of adequate representation of a class is the idea that those being represented possess similar claims constituting a cohesive class and the representative is a member of this class. See Hansberry v.Lee (1940), 311 U.S. 32, 40-46. *Page 25 
 {¶ 61} The court correctly noted that questions of adequacy in class actions look to both the class representative and counsel. Vinci v.American Can Co. (1984), 9 Ohio St.3d 98, 101. The courts employ a broad, inclusive standard for determining the adequacy of class representation:
 {¶ 62} "Moreover, any doubts about adequate representation, potential conflicts, or class affiliation should be resolved in favor of upholding the class, subject to the trial court's authority to amend or adjust its certification order as developing circumstances demand, including the augmentation or substitution of representative parties."Baughman, 88 Ohio St.3d at 487.
 1. Antagonistic Claims {¶ 63} Ford argues that Westgate's class claims are inherently antagonistic because Westgate alleged that Ford gave some dealers greater appeal level CPA than other dealers. In other words, Ford believes that Westgate complains that some other Ford dealers profited at the same time that it suffered loss, thus creating "ever-changing subsets of winners and losers" with no unanimity in terms of loss.
 {¶ 64} The supreme court has viewed questions of adequacy as being a "serious discrepancy between the position of the representative and that of the class * * *." Baughman, 82 Ohio St.3d at 487. With this standard in mind, we do not view Ford's argument as alleging antagonism between its interest in the litigation with that of the class. Accepting for purposes of argument only Ford's characterization of the appeal level CPA program as creating an ever-changing subset of winners and losers, that argument necessarily means that at some point, almost all of the dealers suffered some loss from Ford's alleged failure to abide by the terms of paragraph 10 of the franchise agreement. For every winner of appeal level concessions, there was *Page 26 
a loser. There would be no antagonism because every member within the class would have a viable claim for an alleged breach of contract.
 {¶ 65} Ford's claim of antagonism is simply a question of damages. Again, even if we were to assume that some members of the class had the bulk of their transactions in the "low price set" of concessions as conceded by Westgate's expert, that fact would not be determinative of the issue of liability under the contract. Questions of antagonism in the context of class action damages typically arise when the type of relief sought is antagonistic within the class. For example, inTober v. Charnita, Inc. (M.D.Pa. 1973), 58 F.R.D. 74, the district court considered the issue of whether the class representative had interests antagonistic to other class members because they sought not common relief for the entire class, but rather alternative relief in the form of an option to either rescind the transaction or retain possession of the land purchased and seek damages. The defendants suggested that this claim for damages might be antagonistic to landowners who wished to retain possession of their land because wide-scale recision by a number of class members might have an adverse effect upon the value of the lands of those members who wish to retain possession. The district court recognized the potential for a conflict of interest between certain class members, but held that:
 {¶ 66} "[W]e are not prepared to deny class action status at this time upon the prospect of a conflict which may or may not arise in the future. It may later become apparent that only a small number of the class may successfully seek recision. *Page 27 
Recision is not a remedy which is automatically granted but must be sought within a reasonable time after discovery of the grounds upon which the remedy is sought. And too, any adverse interest may later be avoided by establishing sub-classes rather than by a denial of class action status. Under Rule 23(c) and (d) the court may modify, alter or amend its class action order at any time before a decision on the merits is reached. Included therein is the power to create sub-classes or terminate class action status at such time as it appears that an insolvable conflict of interest has arisen." Id. at 80 (footnote omitted).
 {¶ 67} Ford has alleged nothing more than the possibility that some members of the class might have suffered no damage. If that allegation comes to fruition, the court may create a subset of those dealers or later terminate the class action if the ascertainment of damages becomes insolvable. At this stage in the litigation, however, the issue of damages is premature.
2. Contradiction of Basic Class Claims
 {¶ 68} Ford again points to portions of Beule's deposition testimony which appears to contradict allegations of the class complaint. These are the same contradictions we addressed and rejected earlier in this opinion. Read in its entirety, Beule's deposition testimony adequately supports the claims made in the complaint.
 {¶ 69} We likewise reject Ford's contention that Beule is "uniformed" about the basic elements of the class claim. In practical terms, the courts have noted a growing sense that adequacy questions more appropriately focus not on the *Page 28 
adequacy of the class representative, but on the adequacy of counsel. InCulver v. City of Milwaukee (C.A.7, 2002), 277 F.3d 908, 910, the court stated:
 {¶ 70} "The class action is an awkward device, requiring careful judicial supervision, because the fate of the class members is to a considerable extent in the hands of a single plaintiff (or handful of plaintiffs, when, as is not the case here, there is more than one class representative) whom the other members of the class may not know and who may not be able or willing to be an adequate fiduciary of their interests. Often the class representative has a merely nominal stake (Culver has no stake), and the real plaintiff in interest is then the lawyer for the class, who may have interests that diverge from those of the class members. The lawyer for the class is not hired by the members of the class and his fee will be determined by the court rather than by contract with paying clients. The cases have remarked the danger that the lawyer will sell out the class in exchange for the defendant's tacit agreement not to challenge the lawyer's fee request." (Citations omitted.)
 {¶ 71} Indeed, in some instances, class counsel have been characterized as "entrepreneurs who bear a substantial amount of the litigation risk and exercise nearly plenary control over all important decisions in the lawsuit." Macey and Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform (1991), 58 U.Chi.L.Rev. 1, 3. InGreenfield v. Villager Indus., Inc. (C.A.3, 1973), 483 F.2d 824, 832, fn.9, the court stated, "[experience teaches that it is counsel for the class representative and not *Page 29 
the named parties, who direct and manage [class] actions. Every experienced federal judge knows that any statements to the contrary is sheer sophistry."
 {¶ 72} Beule's lack of information, if any, about the class action is of no particular consequence in this case. In Mominey v. Union EscrowCo., supra, Cuyahoga App. No. 82187, 2003-Ohio-5933, we stated at ¶ 11:
 {¶ 73} "However, a class representative's familiarity with legal and factual issues varies depending on the individual case; some litigation does not require him to have an extensive knowledge of the issues, and in some cases it may be unreasonable to expect him to have knowledge. The adequacy inquiry focuses on Mominey's factual or legal knowledge only to the extent that such knowledge is necessary to her role as class representative, and certification is denied on this ground only in extreme cases, such as where the proposed representative's lack of knowledge shows a lack of interest in or lack of connection with the proceedings or threatens to prejudice the class." (Footnotes omitted.)
 {¶ 74} This case is obviously being driven by class counsel, as demonstrated by the different filings in different venues across the country. In view of counsel's role in prosecuting this action, Beule's role as class representative is nominal. It is not surprising that Beule lacked knowledge on how the complaint had been drafted and had not done any "special investigation" of any of the topic areas contained in his notice of deposition. In fairness to Beule, however, his deposition demonstrates that he has a sufficient grasp of the appeal level CPA program and other issues *Page 30 
raised by the complaint. Moreover, his testimony showed his determination to seek redress for Ford's alleged breach of the franchise agreement. The court could have reasonably found that, despite Beule's lack of involvement in the mechanics of the action, he demonstrated a sufficient grasp of the issues to justify his status as class representative.
 E. Predomination {¶ 75} In addition to the Civ.R. 23(A) prerequisites, the court found that questions of law or fact common to the class predominated over individual questions, and that a class action was superior to other available methods for the fair and efficient adjudication of the controversy. See Civ.R. 23(B)(3). Ford argues that the court abused its discretion by making these findings because it failed to engage in a rigorous analysis of how or why the form contracts or standardized practices satisfy the predominance requirement.
 1. {¶ 76} Civ.R. 23(B)(3) states that a class action is maintainable if:
 {¶ 77} "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation *Page 31 
concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."
 {¶ 78} The supreme court has held that "it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication. And, in determining whether a class action is a superior method of adjudication, the court must make a comparative evaluation of the other processes available to determine whether a class action is sufficiently effective to justify the expenditure of judicial time and energy involved therein." Schmidt v. Avco Corp. (1984), 15 Ohio St.3d 310, 313.
 {¶ 79} By its own admission, the supreme court has noted that "clear guidance as to [Civ.R. 23(B)(3)'s] meaning and application has been elusive." In re Consolidated Mtge. Satisfaction Cases,97 Ohio St.3d 465, 2002-Ohio-6720, at 18. The supreme court has, however, held that the Civ.R. 23(B)(3) requirement is more stringent than the Civ.R. 23(A) requirement of commonality: "We have held, however, that to establish commonality predominance for purposes of Civ.R. 23(B)(3), It is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication.'" Howland v. *Page 32 Purdue Pharma L.P., 104 Ohio St.3d 584, 2004-Ohio-6552, at ¶ 19, citingSchmidt, 15 Ohio St.3d at 313.
 {¶ 80} Moore's Federal Practice at 23-45 sets forth a number of standards that the courts have used to determine predominance: the substantive elements of class members' claims require the same proof for each class member; the proposed class is bound together by a mutual interest in resolving common questions more than it is divided by individual interests; the resolution of an issue common to the class would significantly advance the litigation; one or more common issues constitute significant parts of each class member's individual cases; the common questions are central to all of the members' claims; and the same theory of liability is asserted by or against all class members, and all defendants raise the same basic defenses.
 2. {¶ 81} Application of the predominance standards shows that the court did not abuse its discretion by finding that Westgate satisfied the Civ.R. 23(B)(3) predominance requirement. All of the class members were bound by paragraph 10 of the franchise agreement, so all of the claims can be resolved by the same proof and legal analysis. The question of Ford's alleged breach is common to all class members, and Ford's defense of these allegations will no doubt be common as against all members of the class.
 {¶ 82} Ford argues a lack of predomination based on Beule's deposition testimony and his failure to confirm various allegations of the complaint. Our earlier *Page 33 
rejection of this argument applies with equal force in this context, and it need not be repeated.
 3. {¶ 83} Ford also argues that damage assessments will be so highly individualized that they cannot be calculated on a class-wide basis. For example, Ford notes that part of the alleged damages consisted of "floor plan interest."[8] Westgate alleges that Ford artificially inflated the wholesale price of its trucks so that it could use the appeal level CPA to control dealer profit. By inflating the wholesale price of a truck, Ford additionally profited in the amount of floor plan interest it received from the dealers — the higher the wholesale truck price charged to a dealer, the more interest a dealer would have to pay when financing the truck through Ford. Westgate further alleged that even though dealers were required to repay FMCC within 48 hours of a sale, Ford would take 30-60 days to pay the CPA discount, thus requiring dealers to carry the CPA amounts as receivables.
 {¶ 84} Denial of class certification is not warranted simply because damages might differ among class members. The supreme court expressly rejected this contention in Ojalvo v. Bd. of Trustees of Ohio StateUniv. (1984), 12 Ohio St.3d 230, 232, and this position is consistent with the weight of authority. See, e.g., 5 *Page 34 
Moore's Federal Practice, supra at 23.45[2][a] ("In class actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred. Nevertheless, if common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied, even if individual damages issues remain.") (Footnotes and parenthetical omitted.)
 {¶ 85} The type of damages suffered by the dealers is similar in kind, if not amount. These damages are therefore common across the class and the court could reasonably conclude that they predominated over questions concerning the amount of individual damages.
 4. {¶ 86} Ford next argues that Westgate's expert, Dr. Ben-Shahar, issued a report on damages that conflicted with the basic nature of the class claim because the damages model assumed that not all of the dealers would have been damaged.
 {¶ 87} Dr. Ben-Shahar gave his opinion that Ford engaged in reverse two-part pricing. In a typical two-part pricing system, the seller sets an initially low price, only to create add-on pricing up to the point of the buyer's maximal willingness to pay. In a reverse two-part pricing system, the seller offers to sell an item at an inflated price, with the second-tier being a discount off that inflated price to arrive at the buyer's maximal willingness to pay. Under either pricing system, the buyer pays the same "final" price and the seller obtains the same profit, and the original price is never *Page 35 
actually paid and is known by both parties to be "irrelevant." What changes is the actual profit because it is based on what each individual buyer is willing to pay. Dr. Ben-Shahar explained that the only way for a buyer to avoid reverse two-tier pricing is to enter into an initial bargain or contract with the seller in which the seller becomes obligated to utilize a uniform, published price. He expressed his opinion that paragraph 10 of the franchise agreement eliminated a two-part price system, obligated Ford to publish truck prices in "price schedules or other notices," and allowed Ford to change these published prices only by issuing new price bulletins or schedules.
 {¶ 88} Dr. Ben-Shahar admitted that his discussion of how damages should be measured would be "`abstract' in the sense that it will provide only a general characterization of the difference between the dealer's position had the contract been performed and his actual position following breach." He relied on a restitution theory of damages which would prevent the unjust enrichment of the party in breach. Forcing Ford to disgorge its profit would require the court to ascertain the difference between the "promised" price for a truck and the actual price paid. Dr. Ben-Shahar stated that the dealers' damages should "equal the sum of the differences between the actual prices (a record of which exists with the plaintiff) and the hypothetical price that Ford would have charged had it complied with Paragraph 10." This meant that the court would need to "approximate" what price Ford would have charged the dealers had it set prices in conformity with its contractual obligation to the dealers. *Page 36 
 {¶ 89} The damages model assumed that Ford would set a uniform price that would maximize Ford's profit. Such a price would necessarily assume a conservative estimate of the dealers' loss.[9] Dr. Ben-Shahar proposed that the court create a demand curve for every given truck series. To do this, he proposed using the dealers' compilation of sales prices for each truck series. To calculate Ford's marginal cost of production for each truck model, Dr. Ben-Shahar proposed using the lowest price Ford charged for any given truck under the two-part pricing system. He then proposed to calculate each dealer's loss in a two-pronged manner. First, he proposed to identify the "basic loss" by examining transactions in which the actual truck price exceeded the violation-free truck price. He called this the "high price set." Second, he proposed to identify all the remaining transactions in which the actual price was below the estimated violation-free price. He characterized these as sales that would not have taken place in a violation-free environment, but which took place as a result of the violation. He called this the "low price set." Hence, the dealer loss would be measured by "the difference between the actual prices and *Page 37 
estimated violation-free price, taking into account that this difference can be positive or negative."
 {¶ 90} This final statement forms the basis of Ford's argument that damages may conflict with the class claims because Dr. Ben-Shahar acknowledged that if some dealers had the bulk of their transactions in the "low price set," their calculated loss would be negative; that is, they would have no damages. This statement prompted Ford to request permission to depose Dr. Ben-Shahar to examine the extent to which his damages model relied upon individual factual inquiries and the predominance of individual facts driven by his model. Ford also noted that Dr. Ben-Shahar had prepared a report in the Bayshore litigation that allegedly contradicted several of his Westgate damages conclusions, including whether Ford's alleged deviation from the franchise agreements was favorable to the dealers and whether there was a theoretical possibility that the dealers would be benefitting, rather than losing, as a result of Ford's pricing policy.
 {¶ 91} Westgate opposed Ford's request to depose Dr. Ben-Shahar on grounds that it was unnecessary to the determination of class issues. It maintains that differences in remedies or varying amounts of damages do not negatively impact class determination. Moreover, it complained that it would be prejudicial to allow Ford to take Dr. Ben-Shahar's deposition because Ford had wrongfully withheld information that Dr. Ben-Shahar needed to develop his damages model. Westgate suggested that it would be more economical to allow a single deposition of *Page 38 
Dr. Ben-Shahar after he had gained access to needed discovery and more fully developed the damages model.
 {¶ 92} Ford conceded that the court had discretion to allow Dr. Ben-Shahar's deposition to go forward. While the courts have ruled that discovery on class issues is often desirable, see, e.g., OppenheimerFund, Inc. v. Sanders (1978), 437 U.S. 340, 351, fn.13, the court retains broad discretion "to determine whether, and to what extent, to allow discovery with respect to class certification issues." 5 Moore's Federal Practice, section 23.85[1].
 {¶ 93} Dr. Ben-Shahar's damages model may not have been fully developed, but the court found that the type of damages recoverable by the class are identical because they involve overcharge damages caused by Ford's alleged breach. Hence the court found "[t]he damages of each class member differ only in amount, not in kind." Slip.Op. at 6. At this stage of the proceedings, Dr. Ben-Shahar's damages model shows a predomination of damages across the class.
 {¶ 94} The court's class certification does not, however, foreclose the possibility that Ford could not, at a later time, challenge Dr. Ben-Shahar's damages model as failing to show a predominance of damages across the class. Dr. Ben-Shahar conceded that "[i]f some of the dealers had the bulk of their transactions in the Low Price Set, their calculated loss will be negative, and those dealers would have suffered zero damages." The damages model shows that it is entirely possible *Page 39 
that some members of the class might have profited from Ford's actions, regardless of any breach.
 {¶ 95} As stated earlier, the Ohio Supreme Court has held that "a trial court should not dispose of a class certification solely on the basis of disparate damages." Ojalvo v. Bd. of Trustees of Ohio StateUniv. (1984), 12 Ohio St.3d 230, 232. The parties agree that Dr. Ben-Shahar's damages model is incomplete — Ford seeks to depose Dr. Ben-Shahar to ascertain the basis for his damages model; Westgate claims that Dr. Ben-Shahar has been unable to fully develop his damages model because of Ford's unwillingness to produce discovery. With class certification, the damages issue can be fully developed according to Michigan law[10] which requires that contract damages be ascertained with "reasonable certainty." Alan Custom Homes, Inc. v. Krol (2003), 256 Mich.App. 505, 512; 667 N.W.2d 379. In the event that additional discovery causes Ford to believe that class damages cannot be calculated to a reasonable degree of certainty, it may ask the court to decertify the class.
 5. {¶ 96} Ford argues that class certification should not have been ordered because the court failed to engage in a "most significant contacts" inquiry for each class member on the choice of law issue relating to contract statutes of limitations. It *Page 40 
maintains that application of Ohio's 15-year statute of limitations for written contracts (see R.C. 2305.06) would unfairly subject it to claims occurring far beyond the statutes of limitations of most other states.[11]
 {¶ 97} The courts have stated that "possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action, predominance, are otherwise present. In re Energy Sys.Equip. Leasing Securities Litigation (E.D.N.Y. 1986), 642 F.Supp. 752,753 (collecting cases). In reaching this conclusion, the courts have rejected a per se rule that prohibits class certification when there are statute of limitations differences among the class members. Thus, inWaste Mgmt. Holdings, Inc. v. Mowbray (C.A.1, 2000), 208 F.3d 288, 296, the United States Court of Appeals for the First Circuit stated:
 {¶ 98} "Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may *Page 41 
affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). See 5 James Wm. Moore et al., Moore's Federal Practice § 23.46[3], at 23-210 to-211 (3d ed. 1999). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test." (Footnote omitted.)
 {¶ 99} Consistent with this application of the analagous Fed.R.Civ.P.23, we find that a "sufficient constellation of common issues" binds the dealers together in this litigation in a manner that militates against denying class certification due to differences in home state statutes of limitations. All of the dealers' claims derive from a uniform alleged breach of the same franchise agreement. To the extent that the home forum statute of limitations might differ as to individual dealers, that issue is individual and does not predominate over the common issues relating to the alleged breach of the franchise agreement. We conclude that for purposes of predomination, issues relating to the statute of limitations do not present a per se bar to class certification.
 {¶ 100} Having found that the court did not abuse its discretion by
certifying the class, we overrule the assignments of error. *Page 42 
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, JUDGE
[1] When we refer to "dealers" we mean it to designate medium/heavy truckdealers as represented by the class members in this case.
[2] Paragraph 10 of the franchise agreement states:
"Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable HEAVY DUTY TRUCK TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN. Except as otherwise specified in writing by the Company, such prices, charges, discounts and terms of sale shall be those in effect, and delivery to the Dealer shall be deemed to have been made and the order deemed to have been filled on the date of delivery to the carrier or the Dealer, whichever occurs first. The Company has the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS by issuing a new HEAVY DUTY TRUCK or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price schedules or other notices. In the event the Company shall increase the DEALER PRICE for any COMPANY PRODUCT, the Dealer shall have the right to cancel, by notice to the Company within ten (10) days after receipt by the Dealer of notice of such increase, any orders for such product placed by the Dealer with the Company prior to receipt by the Dealer of notice of such increase and unfilled at the time of receipt by the Company of such notice of cancellation."
[3] Fed.R.Civ.P. 41(a)(2) states in part, "* * * an action shall not be dismissed at the plaintiffs instance save upon order of the court and upon such terms and conditions as the court deems proper."
[4] Section 2283, Title 28, U.S. Code, prohibits federal courts from issuing injunctions to stay state court proceedings except "as expressly authorized by Act of Congress;" "where necessary in aid of its jurisdiction;" or "to protect or effectuate its judgments."
[5] Fed.R.Civ.P. 23(f) states, "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders."
[6] In Ohio, an order denying class certification is considered a final order. R.C. 2505.02(B)(5) states that an "* * * order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is * * * [a]n order that determines that an action may or may not be maintained as a class action; * * *."
[7] The Eleventh Circuit then rejected the All Writs Act as a basis for entering aninjunction. In doing so, it questioned the applicablity of Bridgestone/Firestone because the district court failed to point to circumstances to explain how the Bayshore plaintiffs' participation in the Westgate action would affect its ability to manage the case before it. Id. at 1256-1257.
[8] The complaint alleged that dealers purchased trucks from Ford and financed those purchases with loans obtained through Ford Motor Credit Corporation ("FMCC"). When a truck sold, the dealers had to repay those loans within 48 hours. See Complaint at TJ36-39.
[9] For example, suppose a customer is willing to pay $50,000 for a truck that costs Ford $40,000 to build. Ford could set its wholesale price at $45,000, so that both it and the dealers would realize identical $5,000 profits. Now suppose that Ford sets the wholesale price of the truck at $48,000. If the purchase price of the truck remains $50,000, Ford will have an $8,000 profit while the dealer will only have a $2,000 profit. Hence, Ford's attempt to maximize its own profit will inversely affect the dealer's profit.
[10] The parties agreed that the substantive law of the state of Michigan would apply to the franchise agreement. See Franchise Agreement, paragraph 32.
[11] Ohio's and Kentucky's 15-year statutes of limitations for written contracts are the longest limitations periods for contracts that are not under seal. See Ky.Rev.Stat.Ann. 413.100. Several states have three-year limitations periods for written contracts. See Alaska Stat. 09.10.55; N.H. Rev.Stat.Ann. 508(4); N.C. Gen.Stat. 1-52(1) . On average, states appear to employ limitations periods of four to six years. See, e.g., Mich.Comp. Laws Ann. 600.5807(8) (six years); Neb.Rev.Stat. 25-205(1) (five years); Fla.Stat. 95.11 (five years); Cal. Code Civ.Pro. 337 (four years). *Page 1